PRESENT:  Hassell, C.J., Lacy, Keenan, Kinser, Lemons, and Agee, JJ., and Stephenson, S.J.

SHERMAINE A. JOHNSON

v.  Record No. 031306  OPINION BY JUSTICE BARBARA MILANO KEENAN
                                        January 16, 2004
COMMONWEALTH OF VIRGINIA

FROM THE CIRCUIT COURT OF THE CITY OF PETERSBURG
James E. Kulp, Judge Designate


In this appeal of a judgment confirming a death sentence imposed in a resentencing proceeding in a capital murder case, we consider a range of issues including the question whether the trial court erred in refusing to impose a life sentence pursuant to Atkins v. Virginia, 536 U.S. 304 (2002) (Atkins III).  We also consider the constitutionality of Code § 19.2-264.3, which provides that a resentencing proceeding on remand be held before a different jury than the jury that originally tried the defendant.

I. PROCEEDINGS

In July 1998, the defendant, Shermaine A. Johnson, was convicted in a jury trial of the capital murder of Hope D. Hall in the commission of rape, in violation of Code § 18.2-31(5), and of rape, in violation of Code § 18.2-61.  The circuit court sentenced Johnson in accordance with the jury verdict to death for capital murder and to life imprisonment for rape.  We affirmed the circuit court's judgment in Johnson v.

<u>Commonwealth</u>, 259 Va. 654, 684, 529 S.E.2d 769, 786-87, <u>cert. denied</u>, 531 U.S. 981 (2000).

After exhausting his remedies on direct appeal, Johnson filed a petition for a writ of habeas corpus.  Johnson alleged, among other things, that he was denied effective assistance of counsel during the penalty phase of his capital murder trial because his trial counsel failed to request an instruction informing the jury that Johnson would be ineligible for parole if sentenced to life imprisonment for capital murder.

Based on the holding in <u>Simmons v. South Carolina</u>, 512 U.S. 154, 156 (1994), that a defendant whose future dangerousness is at issue is entitled to have the jury informed of his parole ineligibility during the penalty phase of his trial, we awarded Johnson a writ of habeas corpus and vacated his death sentence on the capital murder conviction.  We remanded the case to the circuit court for a new sentencing proceeding on that conviction.

At the resentencing hearing, a different jury fixed Johnson's punishment for capital murder at death based on findings of both "future dangerousness" and "vileness."  The circuit court sentenced Johnson to death on the capital murder charge in accordance with the jury verdict.  Johnson appeals.

## II. THE EVIDENCE

In Johnson's original appeal to this Court, we stated in detail the facts relating to his convictions on the capital murder and rape charges. Johnson, 259 Va. at 662-66, 529 S.E.2d at 773-76. We will recite those facts from our previous opinion that are relevant to the present proceedings:

On July 11, 1994, the nude body of 22-year-old Hope Denise Hall was found on the bedroom floor of her apartment in Petersburg. She had been stabbed 15 times, including fatal stab wounds to her back, chest, and neck.

Hall's body had abrasions on the nose and left cheek. The body also had a broken, ragged fingernail that Dr. Deborah Kay, an assistant chief medical examiner for the Commonwealth, testified was a "defense-type" injury. Dr. Kay also testified that death "is not generally immediate" with wounds such as those suffered by Hall, and that she initially would have remained conscious after the wounds were inflicted.

The police found blood on two "steak" knives, which were lying on a counter in Hall's kitchen. Blood was also found on a piece of a broken drinking glass located on the kitchen counter, and there was additional blood on the kitchen counter and floor. The police recovered from the kitchen floor an earring, five strands of hair, and a partial shoe print containing some blood. The matching earring was found in Hall's bedroom.

The outside door to Hall's apartment was locked, and the police found a partial fingerprint and smears of blood on the inside panel of that door, which was located near the kitchen. The police recovered two additional "steak" knives, one on Hall's bed and one in her bathroom. The telephone wires in her bedroom had been pulled out of the wall.

A smear of blood and blood splatters were located on the bedroom wall near the victim's body. The police found additional blood on the bedroom floor,

3

dresser, sheets, and bedspread.  There was no sign of forced entry into the apartment.

## DNA Evidence

Jean M. Hamilton, a forensic scientist employed by the Virginia Division of Forensic Science, testified that she performed DNA testing using the "polymerase chain reaction," or PCR, technique on evidence recovered from the crime scene and a blood sample and vaginal swabs collected from Hall's body during an autopsy.  Hamilton concluded that the DNA from the blood found on the knife on the bed, the knives in the kitchen, the kitchen countertop, and the front door all matched the DNA from Hall's blood sample.

Hamilton determined that the DNA from Hall's blood did not match the DNA from the blood on the handle of the knife found in the bathroom.  However, the blood from the broken glass in the kitchen and one bloodstain on the bedspread contained a mixture of Hall's DNA and DNA from the same person whose blood was on the handle of the knife found in the bathroom.

Hamilton testified that DNA from sperm detected in two semen stains on the sheets and DNA from another stain on the bedspread came from the same person as the DNA from the blood on the bathroom knife.  However, the DNA from the sperm detected in the vaginal swab taken from Hall's body came from more than one person.

. . . .

Hamilton then performed a more discriminating type of DNA analysis, known as "restriction fragment length polymorphism" or RFLP testing, on the DNA from two semen stains found on the sheet and the bedspread. After obtaining the DNA profile from those two stains, Hamilton searched the DNA data bank maintained by the Division of Forensic Science to determine if the DNA profile obtained from the crime scene evidence matched any DNA profile on record in the DNA data bank. Hamilton did not find a matching DNA profile at the time of her initial search in March 1996, at which

time there were about 5,000 samples in the DNA data bank.

In August 1996, Hamilton performed a second search of the DNA data bank after about 2,500 more samples had been added to the bank. Hamilton's second search revealed that one DNA profile contained in the data bank was consistent with the DNA profile that she had obtained from the crime scene evidence. This matching DNA profile belonged to the defendant, Shermaine A. Johnson, who was incarcerated in the Southampton Correctional Institute.

. . . .

Other Crimes Evidence

Prior to trial, the Commonwealth gave Johnson notice that it intended to present evidence during the guilt phase of the trial that Johnson had raped 21-year-old Lavonda Scott on July 2, 1994, and 15-year-old Janel Chambliss on August 31, 1994. Over Johnson's objection, the trial court permitted both Scott and Chambliss to testify about these crimes, after finding that there were "numerous" similarities between the crimes committed against Scott and Chambliss and the pending charges against Johnson.

The trial court cited the following factors in its decision to permit the testimony of Scott and Chambliss. All three victims were young African-American women. Scott and Chambliss both knew Johnson and allowed him to enter their homes. There was no sign of forced entry into Hall's apartment. Johnson assaulted both Scott and Chambliss after requesting a glass of water. He then seized knives from their kitchens. There was a broken drinking glass in Hall's kitchen, and the knives used to kill Hall came from her kitchen.

Johnson forced both Scott and Chambliss to remove all their clothing before raping them. Hall's body was totally nude and her clothes were found near her body. Johnson threatened both Scott and Chambliss, stating that he would kill them if they did not follow his directions. When Chambliss resisted and struggled with Johnson, he stabbed her. There was evidence of a

5

struggle in Hall's apartment and Hall was fatally stabbed. All three crimes occurred within a [60]-day period in 1994.

Id. (Footnote omitted).

Before the resentencing proceeding on remand, Johnson filed various motions in the circuit court. In one motion, Johnson asked the circuit court to prohibit the Commonwealth from using "live" testimony to present evidence of his guilt and to require the Commonwealth to "rely on the transcript as previously made to introduce this evidence." However, during another argument before the circuit court, Johnson objected to the Commonwealth's "use [of] transcripts versus live testimony and how it hinders the defense in its ability to cross-examine witnesses . . . and how it could have a prejudicial [e]ffect on the jury." Johnson also asked the circuit court to allow him to present evidence of his "innocence" during the resentencing hearing. The circuit court denied Johnson's requests and granted the Commonwealth's motion to prohibit Johnson from presenting evidence, cross-examining witnesses, or making any argument in relation to his claim of innocence.

Johnson also requested that the circuit court impose a life sentence on the ground that the jury in his first trial would have fixed punishment at life imprisonment on the capital murder charge had the jury been properly instructed concerning his ineligibility for parole. In support of this motion, Johnson

6

presented affidavits from two jurors who served during Johnson's first trial. In the affidavits, the jurors stated that had they "known that Mr. Johnson would receive a sentence of life without the possibility of parole," they "would have recommended that sentence instead of the death penalty." The circuit court denied Johnson's motion.

Johnson also asked the circuit court to impose a life sentence on the ground that he was 16 years old at the time of these offenses. The circuit court denied this motion, as well as Johnson's motion that the capital murder and death penalty statutes be declared unconstitutional on various grounds.

Johnson further requested that the circuit court impose a life sentence based on his alleged "mental illness." Johnson asserted that he had been diagnosed as suffering from "Dissociative Identity Disorder" (DID), a mental condition which Johnson described as featuring "the presence of two or more distinct identities or personality states that recurrently take control of behavior." Johnson also represented that assessments of his intellectual functioning showed that he had an I.Q. score of 75 in 1991, and an I.Q. score of 78 in 1992.

A psychological evaluation, prepared in February 1991 by a certified school psychologist for the Franklin City Public Schools, concluded that Johnson was "a young man of limited intellectual potential whose academic achievement and other

7

school-related skills are commensurate with expectations for the slow learning student."  The report described Johnson's I.Q. score:

> [Johnson's] Full Scale I.Q. places him in the "borderline" range of cognitive development, with a 95% chance that his true score falls between 69 and 81.  He obtained a Verbal Scale score of 81, a Performance Scale score of 72, and a Full Scale Intelligence Quotient of 75.

Although the report classified Johnson as a "slow learner," it stated that Johnson's "learning status does not . . . indicate eligibility for special education services."  The report concluded that Johnson was "in great need of emotional and academic support within the school setting."

Johnson argued to the circuit court that his low I.Q. scores could "qualify him to be considered as mentally retarded" and thus ineligible to receive the death penalty under the United States Supreme Court's ruling in Atkins III.  Johnson further asserted that his low intelligence and his DID diagnosis indicated that he suffered from a "mental impairment sufficient to make him ineligible for the death penalty."  The Commonwealth argued in response that there was no evidence indicating that Johnson was mentally retarded.

At the time of Johnson's resentencing proceeding, the General Assembly had not yet enacted legislation providing procedures to resolve claims of mental retardation raised by

8

defendants in capital murder cases.  In considering Johnson's claim, the circuit court relied on a definition of mental retardation found in proposed legislation that at the time had been approved by the Senate of Virginia but had not been voted upon by the House of Delegates.  The circuit court stated:

> [T]he Senate passed the bill, and it has the same definition for mental retardation as the American Psychiatric Association.  And under that bill . . . it had a two part definition of mentally retarded:  In order to be considered mentally retarded inmates must have substantial subaverage, general intellectual function, existing concurrently with significant limitations and adaptive functioning, both of which were before the age of 18.  The bill defines significantly subaverage general intellectual functioning at an IQ of 70 or below as measured by scientifically recognized and standardized intelligence quotient testing.
>
> Significant limitations and adaptive intellectual functioning means significant limitation in two or more skill areas such as communication, self-care, home living, social and interpersonal skills, and health and safety according to the bill.

The circuit court concluded that it had "not been presented any evidence as of this point of [mental] retardation under the definition which the Court adopts."  The court denied Johnson's motion but indicated that he could renew his request upon presenting further evidence regarding his claim of mental retardation.

During Johnson's resentencing hearing, the Commonwealth presented to the jury evidence of Johnson's guilt.  The parties stipulated that Johnson's blood was found on a knife taken from

9

Hall's bathroom and on a broken glass discovered in Hall's kitchen. The jury also was informed that Johnson's sperm was found on Hall's bed sheets, bedspread, and in a "vaginal cervical swab" taken from Hall's body. In addition, the parties stipulated that Johnson had admitted to the police that he had been in Hall's apartment on the night of her murder.

The Commonwealth also presented evidence of Johnson's criminal record and of certain unadjudicated acts. The evidence showed that in August 1992, when Johnson was 14 years old, he sexually assaulted Elsie Soto in the State of New Jersey. In January 1994, he raped Nicole Lisa, also in the State of New Jersey.

On June 29, 1994, Johnson raped Tiffany Burgess in the State of New York. A few days later, Johnson raped Lavonda Scott in the City of Franklin, Virginia. In August 1994, he raped and abducted Janel Chambliss in the City of Franklin. Johnson also was convicted of breaking and entering into Chambliss' home with the intent to rape her.

In conjunction with this evidence of prior convictions, the Commonwealth presented the transcribed testimony of Tiffany Burgess given in Johnson's first trial, and read that testimony into evidence before the jury. Burgess testified that she was 15 years old when Johnson lured her to a friend's apartment under the pretext of showing her a present he was planning to

10

give to her friend.  Burgess stated that once they arrived at the apartment door, Johnson grabbed her from behind, placed her in a "choke hold" while wielding a "big knife," and forced her inside the apartment.  Burgess also stated that Johnson ordered her to remove all her clothing and to perform oral sodomy on him before he raped her at knifepoint.

Elsie Soto testified that she was 12 years old when Johnson sexually assaulted her.  Soto stated that Johnson, who attended her school, had arrived at her house one day and asked to talk with her.  Soto stated that after she refused to let Johnson come into the house, he gained forcible entry through a kitchen window.  Soto testified that Johnson held her down on a bed and repeatedly hit her in the face while he exposed himself and fondled her breasts and vagina.

Nicole Lisa testified that she was 13 years old when Johnson raped her in January 1994.  Lisa's testimony revealed that as she was leaving her apartment for school one morning, Johnson grabbed her from behind and placed a "steak knife" against her neck.  Johnson "dragged" Lisa to the "back hallway elevator shaft" of her apartment building, where he ordered her to remove all her clothing before raping her at knifepoint.

Janel M. Chambliss testified that she was 15 years old and was babysitting her seven-month-old nephew when Johnson raped her.  Johnson, who was Chambliss' neighbor, arrived at

Chambliss' house and requested a glass of water. About that time, her nephew began to cry. When Chambliss picked up her nephew, Johnson approached her from behind and placed a "steak knife" against her throat. Johnson told Chambliss that "he came to do one thing and one thing only," and that he would kill both Chambliss and her nephew if she did not follow his instructions.

Chambliss then attempted to thwart Johnson's attack. During the ensuing struggle, Johnson stabbed Chambliss. Once Johnson gained physical control over Chambliss, he ordered her to perform oral sodomy on him. When she refused, Johnson raped her.

Lavonda S. Scott testified that she was 21 years old when Johnson raped her. Scott's testimony indicated that Johnson was a family friend and that she had known him for eight years before the attack. Johnson, who was 16 years old, did not have a place to live and had been spending some nights at Scott's house.

One night, when Scott's children were in the home, Johnson approached Scott from behind, pulled her hair, and pressed a "steak knife," which he had obtained from Scott's kitchen, "deep into [her] throat." Johnson told Scott that if she did not remove her clothing, he would stab and kill her. Johnson forced Scott to remove her clothes and to perform oral sodomy on him.

12

Johnson then raped Scott while holding the knife against her body.

The Commonwealth next presented testimony from several of Hall's relatives, including her mother and her son, who related the impact of Hall's death on their lives. At the conclusion of the Commonwealth's evidence, Johnson moved to strike the evidence on the ground that the Commonwealth had failed to present sufficient evidence to establish either "future dangerousness" or "vileness." The circuit court denied Johnson's motion.

Johnson presented testimony from Annie Mae Stephens, his great aunt. Stephens testified that when Johnson was about 12 years old, she went to visit Johnson and his mother, Angela, at their house. Stephens stated that upon arriving at the house, she observed Johnson leaving a room. Stephens stated that Johnson appeared to be "aggravated," "hurt," and "angry." Stephens further testified that she entered the room that Johnson had left and discovered Angela in the room, "bleeding between her legs." Stephens stated that Angela informed her that she had been raped by her boyfriend. Stephens was unaware whether Johnson had observed "any act going on" in the room.

Stephens testified that Johnson was close to his mother and that she was "good to him." Stephens also testified, however,

13

that Angela abused drugs and was abusive toward Johnson when she disciplined him.

Virginia Dancy, Johnson's grandmother, testified that Johnson's stepfather was addicted to heroin and was "an abusive husband" to Angela. Dancy stated that Angela became addicted to heroin after she married Johnson's stepfather, and that Johnson had been exposed to their drug use. Dancy also stated that Angela had died of AIDS, and that Johnson's "problems with the law" did not begin until after his mother's death.

Dancy further testified that she had found Johnson and Angela in a "crack house" when Johnson was three years old, and that Johnson was standing in a large room among "a lot of people" who were using cocaine. Dancy stated that she took Johnson to the bathroom and that when he attempted to urinate, he informed her that his penis hurt. Dancy testified that when she observed that Johnson's penis was "red and swollen," he told her that "a lady did it." Dancy stated that when she informed Angela of Johnson's condition and his comment regarding the "lady," Angela replied that nobody had "been bothering" Johnson and that he merely had a bladder infection.

Sheila Wilson, Johnson's cousin and pastor, testified that she had visited Johnson in prison over the previous "year or two." Wilson stated that during her last visit with Johnson, which occurred several weeks before Johnson's resentencing

14

hearing, he related two childhood memories that he had not mentioned before. Wilson testified that Johnson told her that he remembered sitting in the backseat of a car, which had been parked in a public park, while his mother and her boyfriend used heroin in the front seat. Wilson stated that Johnson also told her that he remembered discovering his mother lying in a bathtub with a syringe stuck in her arm.

Johnson also presented the testimony of Delores Dungee-Anderson, a licensed clinical social worker who qualified as an expert in the diagnosis of Dissociative Identity Disorder (DID), formerly known as "multiple personality disorder," and "borderline personality disorder." After interviewing Johnson on three occasions before the resentencing hearing and examining his psychological reports, Dungee-Anderson concluded that Johnson suffered from DID and a possible borderline personality disorder.

Dungee-Anderson testified that DID often occurs as the result of a childhood trauma, such as severe emotional, physical, or sexual abuse. According to Dungee-Anderson, children exposed to such trauma often create "fragmented parts" within their minds as a survival tactic to allow them to escape mentally from any harm that they may be experiencing. These "fragmented parts" or "alters" are separate and distinct personalities that exist within the mind of an individual

15

afflicted with DID.  Different "alters" are "triggered" and emerge when the individual feels threatened or encounters certain other external stimuli.  When an "alter" "takes control of the person," the other "alters" are often unaware of what is happening to the individual.

Dungee-Anderson concluded that Johnson had two separate "alters" that were distinct from Johnson's own personality.  She testified that Johnson had an "alter" named "Shy," and that Johnson was consciously aware of that "alter," a phenomenon that she termed "co-consciousness."

According to Dungee-Anderson, Johnson described "Shy" as being different, stating that "I am very shy. . . .  Sometimes I can't find the right words to talk to people.  I don't know what to say," whereas "Shy is very confident; he can talk to the ladies.  He is very different from me.  He knows what to say." When Dungee-Anderson suggested to Johnson that "Shy" was an alternative personality, Johnson claimed that he was "not crazy" and that "Shy is me; he is not different from me; he is me."

Dungee-Anderson stated that during one of her interviews with Johnson, a different "alter" emerged that was characterized by "rage."  Dungee-Anderson "called out" to this "alter" while she was leading Johnson through a relaxation technique.  She stated that when the "rage alter" emerged, there was a "surge of

16

energy" and the "rage alter" proclaimed that Johnson's mother, who had died in 1992, was in the room.

The "rage alter" stated that he was "mad" at his mother because she lied to him when she told him that "she wouldn't go anywhere" and then left him "in this world by [himself]." The "rage alter" mentioned Johnson's stepfather and then repeatedly stated, "nothing but abuse." The "rage alter" stated that he had "nothing but hate and contempt" for Johnson's stepfather because he had abused Johnson's mother.

When Dungee-Anderson asked the "rage alter" what he did when he experienced such strong feelings, the "rage alter" replied, "I strike out." After Dungee-Anderson asked him in what manner did he "strike out," the "rage alter" replied, "Whatever the situation calls for." When Dungee-Anderson asked him for specific examples of such behavior, Johnson's own personality reemerged. Johnson claimed that he did not remember any of the conversation between Dungee-Anderson and the "rage alter."

Dungee-Anderson testified that she did not believe that Johnson was lying about his condition in an attempt to convince her that he suffered from DID. She noted that Johnson did not want to continue with the interview when she sought more information, and that persons who attempt to deceive her about their condition typically wish to engage in further conversation

17

with her.  Dungee-Anderson further stated that Johnson experienced a "terrible migraine headache" when his personality "switched" between the "alters," which is a typical characteristic of those suffering from DID.

Dungee-Anderson also noted that Johnson had claimed to "hear voices," which is often symptomatic of DID.  She stated that the memory loss Johnson experienced during episodes of conduct by his personality "alters" is another symptom of DID.  Dungee-Anderson conceded, however, that Johnson could recall attacking Hall and most of his other victims.

Dungee-Anderson testified that DID is different from mental retardation and that based on Johnson's test results, he did not appear to have a "mental retardation problem."  She also stated that Johnson had never been diagnosed as being mentally retarded.

Dungee-Anderson further testified that individuals suffering from DID typically have lower I.Q. scores because various "alters" may learn different information of which the individual as a whole may be unaware.  Dungee-Anderson observed that "[i]f you are not in school for some information, you can't repeat it when you do the IQ testing.  That is well-known in testing."

At the conclusion of the evidence, Johnson renewed his motion to strike the Commonwealth's evidence on the ground that

the Commonwealth failed to establish "future dangerousness" or "vileness."  The circuit court denied Johnson's motion.

The jury fixed Johnson's punishment at death, finding that there was a "probability that he would commit criminal acts of violence that would constitute a continuing serious threat to society."  The jury also found that Johnson's "conduct in committing the offense is outrageously or wantonly vile, horrible or inhuman in that it involved torture[,] depravity of mind[,] [and] aggravated battery to the victim beyond the minimum necessary to accomplish the act of murder."

At the sentencing proceeding in the circuit court following the jury verdict, Johnson introduced in evidence Dungee-Anderson's "psychological diagnostic assessment" of Johnson, which included much of the information she had provided to the jury.  The circuit court also considered a pre-sentence investigation report (PSI), which stated that Johnson had completed the fifth grade and that he had exhibited "significant behavior and academic problems in school."  However, attached to an earlier PSI was a "sex offender evaluation report," which stated that Johnson had completed the eighth grade while attending school in the State of New York.

Before imposing sentence on Johnson, the circuit court inquired whether Johnson wanted "to address whether there [was] any evidence to indicate that the jury imposed the sentence of

death under influence of any passion, prejudice or other arbitrary factor." Johnson replied that he did not wish to make such an argument.

The circuit court sentenced Johnson to death in accordance with the jury verdict. In explaining its ruling, the court stated:

> Upon a mature consideration of all of the evidence, including the defendant's mitigating evidence, the violent nature of this crime, and the defendant's past record which includes five rapes within a seven month period, the Court finds no good cause to overturn the jury's verdict.

### III. ISSUES PREVIOUSLY DECIDED

Johnson raises certain arguments that we resolved against him in his first appeal to this Court, consistent with our previous decisions on these issues. We reaffirm our earlier holdings and reject the following arguments:

A. Virginia's capital murder sentencing statutes fail to provide meaningful guidance to the jury concerning the meaning of the terms "future dangerousness" and "vileness." Rejected in Johnson, 259 Va. at 667, 529 S.E.2d at 776; accord Jackson v. Commonwealth, 266 Va. 423, 430, 587 S.E.2d 532, 538 (2003); Wolfe v. Commonwealth, 265 Va. 193, 208, 576 S.E.2d 471, 480, cert. denied, ___ U.S. ___, 124 S.Ct. 566 (2003); Walker v. Commonwealth, 258 Va. 54, 61, 515 S.E.2d 565, 569 (1999), cert. denied, 528 U.S. 1125 (2000); Cherrix v. Commonwealth, 257 Va.

20

292, 299, 513 S.E.2d 642, 647, cert. denied, 528 U.S. 873 (1999).

B. Virginia's statutory scheme fails to properly inform and instruct the jury concerning its consideration of mitigation evidence. Rejected in Johnson, 259 Va. at 667, 529 S.E.2d at 776; accord Jackson, 266 Va. at 429, 587 S.E.2d at 538; Morrisette v. Commonwealth, 264 Va. 386, 398, 569 S.E.2d 47, 55 (2002); Walker, 258 Va. at 61, 515 S.E.2d at 569; Cherrix, 257 Va. at 299, 513 S.E.2d at 647; Goins v. Commonwealth, 251 Va. 442, 452, 470 S.E.2d 114, 122, cert. denied, 519 U.S. 887 (1996).

C. Virginia's capital murder sentencing statutes improperly allow the Commonwealth to prove "future dangerousness" by the use of unadjudicated criminal conduct, thereby omitting any standard of proof for the admission of such evidence. Rejected in Johnson, 259 Va. at 667, 529 S.E.2d at 776; accord Green v. Commonwealth, 266 Va. 81, 107, 580 S.E.2d 834, 849 (2003); Cherrix, 257 Va. at 299, 513 S.E.2d at 647; Jackson v. Commonwealth, 255 Va. 625, 635, 499 S.E.2d 538, 545 (1998), cert. denied, 525 U.S. 1067 (1999).

D. Virginia's capital murder sentencing statutes are unconstitutional because they allow, but do not require, the court to set aside a death sentence on a showing of good cause and permit the court to consider hearsay evidence in the pre-

21

sentence report.  Rejected in Johnson, 259 Va. at 667-68, 529 S.E.2d at 776; see also Bell v. Commonwealth, 264 Va. 172, 203, 563 S.E.2d 695, 716 (2002), cert. denied, 537 U.S. 1123 (2003); Lenz v. Commonwealth, 261 Va. 451, 459, 544 S.E.2d 299, 303-04, cert. denied, 534 U.S. 1003 (2001); Walker, 258 Va. at 61, 515 S.E.2d at 569; Cherrix, 257 Va. at 299, 513 S.E.2d at 647.

E. Johnson also raises an issue that was not presented in his first appeal but has been decided adversely to his position in our previous decisions.  Johnson asserts that this Court fails to conduct its proportionality and "passion-prejudice" review consistent with constitutional requirements.  We perceive no reason to modify our previously-expressed views rejecting this argument.  See Bell, 264 Va. at 203, 563 S.E.2d at 716; Lenz, 261 Va. at 459, 544 S.E.2d at 304; Satcher v. Commonwealth, 244 Va. 220, 228, 421 S.E.2d 821, 826 (1992), cert. denied, 507 U.S. 933 (1993).

IV. CHALLENGES TO RESENTENCING PROCEDURES AND TESTIMONY

Initially, we observe that Johnson argues that the resentencing proceeding violated his constitutional protection against double jeopardy.  He bases this claim chiefly on the affidavits executed by two jurors at his first trial stating that they would not have voted for the death penalty if they had been properly instructed regarding Johnson's ineligibility for parole.  Johnson also argues that his resentencing violated

22

double jeopardy principles because the prosecution acted in "bad faith" at his first trial by failing to require that the jury be instructed correctly regarding the parole eligibility issue. We do not reach the merits of these arguments, however, because Johnson did not argue during the resentencing proceedings any issue regarding double jeopardy or "bad faith" by the prosecution. See Rule 5:25.

Johnson next argues that the resentencing procedure provided in Code § 19.2-264.3 violates his constitutional right of due process by improperly shifting the burden of proof, thereby requiring him to prove that he should receive a life sentence instead of the death penalty. Johnson further contends that the jury at the resentencing proceeding was not able to "gain the same feel" for the case due to his inability to challenge the Commonwealth's evidence of guilt and to raise issues of "residual doubt." Johnson argues, therefore, that the jury at his resentencing proceeding was more biased in favor of imposing the death penalty, and that the circuit court should have imposed a life sentence based on these defects in the statutory scheme, as well as on the two juror affidavits from his first trial. We disagree with Johnson's arguments.

Code § 19.2-264.3 provides, in relevant part:

> If the sentence of death is subsequently set
> aside or found invalid, and the defendant or the
> Commonwealth requests a jury for purposes of

23

resentencing, the court shall impanel a different jury on the issue of penalty.

The resentencing procedure set forth in this statute did not violate Johnson's due process rights.  During any resentencing proceeding conducted under the statute, the Commonwealth bears the burden of proving beyond a reasonable doubt that the death sentence should be imposed based on evidence of the defendant's "future dangerousness" or on the "vileness" of the crime committed, or on proof of both aggravating factors.  Because the issue of a defendant's guilt has already been decided at the guilt phase of a capital murder trial, the defendant is not permitted to challenge the Commonwealth's evidence of guilt during the penalty phase, whether in the original trial or in a resentencing proceeding. See Atkins v. Commonwealth, 260 Va. 375, 379-80, 534 S.E.2d 312, 314-15 (2000) (Atkins II), rev'd on other grounds, 536 U.S. 304 (2002); Stockton v. Commonwealth, 241 Va. 192, 210-11, 402 S.E.2d 196, 206-07, cert. denied, 502 U.S. 902 (1991); Frye v. Commonwealth, 231 Va. 370, 393-94, 345 S.E.2d 267, 283 (1986). For the same reason, a defendant may not argue during the penalty phase proceedings that there is a "residual doubt" concerning his guilt.  See Atkins II, 260 Va. at 379-80, 534 S.E.2d at 314-15; Lilly v. Commonwealth, 255 Va. 558, 579, 499

S.E.2d 522, 537 (1998), rev'd on other grounds, 527 U.S. 116 (1999); Stockton, 241 Va. at 211, 402 S.E.2d at 207.

All the evidence presented at Johnson's resentencing proceeding was relevant to the issues of "future dangerousness" and "vileness."  In addition to the evidence presented by the Commonwealth, the jury heard extensive evidence from witnesses who testified on Johnson's behalf.  Therefore, we find no merit in Johnson's argument that the resentencing proceeding in this case was "biased," requiring the circuit court to impose a life sentence in place of the jury verdict.

We also observe that in Johnson's habeas corpus petition filed after his original direct appeal, Johnson requested, among other things, a new sentencing proceeding.  Having received the remedy he sought, Johnson cannot complain now that his request was granted.  See Bell, 264 Va. at 185, 563 S.E.2d at 705; Board of Supervisors v. Sentry Ins. A Mut. Co., 239 Va. 622, 624 n.*, 391 S.E.2d 273, 274 n.* (1990); Newsom v. Commonwealth, 207 Va. 844, 847, 153 S.E.2d 235, 237 (1967).

Johnson further argues that the circuit court erred in allowing the Commonwealth to present both live and transcribed testimony while prohibiting Johnson from challenging the veracity of that testimony before the jury.  This argument, however, is partially inconsistent with earlier arguments he made in the circuit court.  As stated above, before his

resentencing proceeding, Johnson initially asked the circuit court to prohibit the Commonwealth from presenting its evidence through "live" witnesses, rather than from transcripts of the original trial. Later in the proceedings, however, Johnson changed his position and objected to the Commonwealth's use of transcripts, claiming that such use would eliminate his ability to cross-examine the witnesses.

We conclude that Johnson's re-framed argument on appeal has no merit. With regard to the admission of transcribed testimony from the first trial, we observe that Tiffany Burgess was the only witness whose testimony was presented in this manner. We hold that the admission of such transcribed testimony at a resentencing proceeding conducted under Code § 19.2-264.3 is a matter submitted to the circuit court's discretion. See Hills v. Commonwealth, 262 Va. 807, 811, 553 S.E.2d 722, 724 (2001); Stockton, 241 Va. at 205-07, 402 S.E.2d at 203-05; Fogg v. Commonwealth, 215 Va. 164, 168, 207 S.E.2d 847, 850 (1974). Here, the circuit court did not abuse its discretion in admitting Burgess' testimony because it was relevant to the issue of Johnson's "future dangerousness," and Johnson had been afforded a full opportunity to cross-examine her entire testimony at the original trial.

We also conclude that the trial court did not abuse its discretion in allowing the Commonwealth to present "live"

witnesses and in restricting Johnson from cross-examining those witnesses on matters related to Johnson's guilt.  The jury at the resentencing proceeding was required to consider the circumstances of the murder in determining whether the Commonwealth had proved the statutory predicates of "future dangerousness" or "vileness," and in ascertaining the proper penalty to be imposed for the crime.  See Code § 19.2-264.2.  In addition, because Johnson's guilt was not a matter at issue in the resentencing proceeding, the circuit court properly restricted Johnson from cross-examining the witnesses regarding his commission of the murder.

## V. CLAIM OF MENTAL RETARDATION

Johnson argues that because he presented extensive evidence of "mental illness" at the resentencing proceeding, he is entitled under Code § 8.01-654.2 to have his case remanded to the circuit court for a jury to consider whether he is mentally retarded.  He contends that he has presented sufficient evidence, including evidence of his low I.Q. scores and his DID, which demonstrates that his claim is not frivolous and that he may suffer from mental retardation "as it is commonly defined." Thus, he asserts that his case should be remanded to the circuit court for a determination whether he is mentally retarded under Code § 19.2-264.3:1.1 and this Court's most recent opinion in

27

<u>Atkins</u>, 266 Va. 73, 581 S.E.2d 514 (2003) (<u>Atkins IV</u>).  We disagree with Johnson's arguments.

After the circuit court entered final judgment in November 2002 imposing the death sentence fixed by the jury in the resentencing proceeding, the General Assembly enacted Code §§ 8.01-654.2 and 19.2-264.3:1.1.  These statutes provide a mandatory procedure for the consideration of issues of mental retardation raised by defendants in capital murder cases.  Code § 8.01-654.2 provides, in relevant part:

> [A]ny person under sentence of death whose sentence became final in the circuit court before April 29, 2003, and who desires to have a claim of his mental retardation presented to the Supreme Court, shall do so by one of the following methods:  (i) if the person has not commenced a direct appeal, he shall present his claim of mental retardation by assignment of error and in his brief in that appeal . . . .  A person proceeding under this section shall allege the factual basis for his claim of mental retardation.  The Supreme Court shall consider a claim raised under this section and if it determines that the claim is not frivolous, it shall remand the claim to the circuit court for a determination of mental retardation; otherwise the Supreme Court shall dismiss the petition.  The provisions of §§ 19.2-264.3:1.1 and 19.2-264.3:1.2 shall govern a determination of mental retardation made pursuant to this section.

Code § 19.2-264.3:1.1(A) states, in relevant part:

> "<u>Mentally retarded</u>" means a disability, originating before the age of 18 years, characterized concurrently by (i) significantly subaverage intellectual functioning as demonstrated by performance on a standardized measure of intellectual functioning administered in conformity with accepted professional practice, that is at least two standard deviations below the mean and (ii) significant limitations in

28

adaptive behavior as expressed in conceptual, social and practical adaptive skills.

In Atkins IV, we explained that the General Assembly enacted these statutes after the United States Supreme Court's decision in Atkins III, which gave the individual states the task of developing procedures for enforcing constitutional restrictions on the execution of the death penalty. Atkins IV, 266 Va. at 79, 581 S.E.2d at 517. Because Johnson's sentence of death became final in the circuit court before April 29, 2003, we consider pursuant to Code § 8.01-654.2 whether his claim of mental retardation is frivolous.

In Code § 19.2-264.3:1.1(A), the General Assembly has articulated a two-fold test that a criminal defendant is required to meet to establish that he is mentally retarded. Thus, a criminal defendant who seeks to demonstrate to this Court that his claim of mental retardation is not frivolous must be able to point to credible evidence in the record supporting the requirements set forth in the statutory test.

In the present case, we hold that Johnson's claim of mental retardation is frivolous. Johnson's own evidence directly refutes his assertion of mental retardation. As stated above, his expert witness, Dungee-Anderson, testified that Johnson is not mentally retarded. The record also shows that Johnson was administered two standardized tests, commonly known as I.Q.

tests, which met the descriptive criteria of Code § 19.2-264.3:1.1(A)(i). His scores of 75 and 78 on these I.Q. tests exceed the score of 70 that the General Assembly has chosen as the threshold score below which one may be classified as being mentally retarded. See id.; American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, 39 (4th ed. 1994) (DSM-IV).

We further observe that Johnson conceded at oral argument in this appeal that the record contains no evidence showing that his alleged DID condition is indicative of mental retardation as defined by the General Assembly in Code § 19.2-264.3:1.1(A). Therefore, we decline Johnson's request that a jury consider his allegation of mental retardation because the present record shows as a matter of law that Johnson is unable to meet the statutory definition of "mentally retarded."

Johnson argues, nevertheless, that based on the Supreme Court's decision in Atkins III barring execution of the mentally retarded, the circuit court erred in refusing to impose a life sentence at his resentencing on the capital murder conviction. We find no merit in this assertion. Because we have concluded that Johnson's claim of mental retardation is frivolous, we necessarily conclude that the circuit court did not err in refusing to impose a life sentence based on Johnson's unsupported allegation.

VI. CHALLENGE TO DEATH PENALTY IMPOSED ON JUVENILE DEFENDANT

Johnson argues that the circuit court should have imposed a life sentence because he was 16 years old at the time of these offenses.  Johnson acknowledges that the United States Supreme Court, in Stanford v. Kentucky, 492 U.S. 361, 380 (1989), upheld the death sentence imposed on a capital murder defendant who was 16 years old at the time of the offense.  Nevertheless, Johnson contends that the United States Supreme Court has indicated by its Atkins III decision a willingness to depart from some of its other precedent rejecting Eighth Amendment challenges of "cruel and unusual punishment."  Johnson contends that this Court should apply a similar analysis as that employed in Atkins III and conclude that under "evolving standards of decency" and recent trends in the various states, the execution of juvenile defendants also constitutes "cruel and unusual punishment" in violation of the Eighth Amendment.[*]  We disagree with Johnson's arguments.

We apply the holding of Stanford that the Eighth Amendment's prohibition against cruel and unusual punishment does not forbid the imposition of the death sentence on a person who commits capital murder at 16 or 17 years of age.  492 U.S.

---

[*] We note that in this appeal Johnson does not challenge under any provision of the Constitution of Virginia the imposition of the death penalty for 16 and 17-year-old persons convicted of capital murder.

at 380; accord Jackson, 255 Va. at 647, 499 S.E.2d at 552; Wright v. Commonwealth, 245 Va. 177, 181, 427 S.E.2d 379, 383 (1993), vacated on other grounds, 512 U.S. 1217 (1994). In the absence of such a constitutional prohibition, we hold that any further determination whether 16 and 17-year-old persons convicted of capital murder should be eligible to receive the death penalty in Virginia is a matter to be decided by the General Assembly, not by the courts.

In reaching this conclusion, we directly reject Johnson's argument that we should anticipate that the United States Supreme Court may reexamine and reverse its holding in Stanford under an analysis similar to the one that the Court applied in Atkins III. When a precedent of the Supreme Court has direct application in a case, we are not at liberty to ignore that precedent in favor of other Supreme Court decisions employing a similar analysis in a different factual and legal context. See Rodriguez de Quijas v. Shearson/American Express, Inc., 490 U.S. 477, 484 (1989); see also United States v. Hatter, 532 U.S. 557, 567 (2001); Hohn v. United States, 524 U.S. 236, 252 (1998). As the Supreme Court has stated, courts "should follow the case which directly controls, leaving to [the Supreme] Court the prerogative of overruling its own decisions." Rodriguez de Quijas, 490 U.S. at 484.

We also find no merit in Johnson's argument that he received the death penalty in part based on crimes he committed before he reached 16 years of age. Johnson raped and murdered Hope Hall when he was 16 years old and he was sentenced to death for the capital murder of Hall, and for no other crime. The history of his prior criminal conduct was properly placed before the jury pursuant to Code § 19.2-264.2, because the jury was required to determine the appropriate punishment for Johnson's act of capital murder, including the issue whether Johnson represented a continuing serious threat to society.

## VII. SENTENCE REVIEW

Under Code § 17.1-313(C), we review the death sentence imposed on Johnson to determine whether it (1) was imposed under the influence of passion, prejudice, or any other arbitrary factor; or (2) is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.

### Passion and Prejudice

Johnson does not contend that the jury verdict fixing the death penalty reflects the influence of passion, prejudice, or any other arbitrary factor. Nevertheless, we have conducted an independent review of the record, and we conclude that the jury verdict does not reflect the influence of any such impermissible factors.

33

## Excessiveness and Proportionality

Johnson does not contend in this appeal that his sentence is disproportionate and excessive when compared to the penalties imposed on other defendants who committed similar offenses. Notwithstanding this fact, we are directed by Code § 17.1-313(C)(2) to make an independent determination regarding this question. In conducting our proportionality review, we must determine "whether other sentencing bodies in this jurisdiction generally impose the supreme penalty for comparable or similar crimes, considering both the crime and the defendant." Jenkins v. Commonwealth, 244 Va. 445, 461, 423 S.E.2d 360, 371 (1992), cert. denied, 507 U.S. 1036 (1993); accord Remington v. Commonwealth, 262 Va. 333, 362, 551 S.E.2d 620, 638 (2001), cert. denied, 535 U.S. 1062 (2002); Schmitt v. Commonwealth, 262 Va. 127, 152, 547 S.E.2d 186, 203 (2001), cert. denied, 534 U.S. 1094 (2002); Hedrick v. Commonwealth, 257 Va. 328, 342, 513 S.E.2d 634, 642, cert. denied, 528 U.S. 952 (1999).

We compare the record in the present case with the records of our other capital murder cases, including those cases in which a life sentence has been imposed. We have reviewed the records of all capital cases considered by this Court under Code § 17.1-313(E). Because the jury in this resentencing proceeding imposed the death sentence based on both statutory predicates of future dangerousness and vileness, we give particular

34

consideration to other capital murder convictions in which the death sentence was based on both predicates.

Johnson's age at the time he raped and murdered Hope Hall is only one factor that we consider in determining whether juries generally impose the death penalty for similar crimes. The record also shows that Johnson committed five rapes within a period of seven months, and that he stabbed one of these rape victims.

Johnson inflicted multiple stab wounds on Hope Hall in the course of murdering her. These numerous stab wounds inflicted on Hall are indicative of the vileness of the present murder and represent the culmination of a pattern of escalating violence over the course of Johnson's commission of the numerous rapes referenced above.

Juries in this Commonwealth generally, with some exceptions, have imposed the death sentence for convictions of capital murder based on findings of vileness and future dangerousness in which the underlying predicate offenses involved violent sexual crimes and the defendant had committed violent crimes on other occasions. See, e.g., Morrisette, 264 Va. 386, 569 S.E.2d 47; Vinson v. Commonwealth, 258 Va. 459, 522 S.E.2d 170 (1999), cert. denied, 530 U.S. 1218 (2000); Hedrick, 257 Va. 328, 513 S.E.2d 634; Cherrix, 257 Va. 292, 513 S.E.2d 642; Payne v. Commonwealth, 257 Va. 216, 509 S.E.2d 293 (1999);

35

*Barnabei v. Commonwealth*, 252 Va. 161, 477 S.E.2d 270 (1996), *cert. denied*, 520 U.S. 1224 (1997); *Wilson v. Commonwealth*, 249 Va. 95, 452 S.E.2d 669, *cert. denied*, 516 U.S. 841 (1995); *Williams v. Commonwealth*, 248 Va. 528, 450 S.E.2d 365 (1994), *cert. denied*, 515 U.S. 1161 (1995); *Breard v. Commonwealth*, 248 Va. 68, 445 S.E.2d 670, *cert. denied*, 513 U.S. 971 (1994); *Mueller v. Commonwealth*, 244 Va. 386, 422 S.E.2d 380 (1992), *cert. denied*, 507 U.S. 1043 (1993); *Spencer v. Commonwealth*, 238 Va. 295, 384 S.E.2d 785 (1989), *cert. denied*, 493 U.S. 1093 (1990); *Coleman v. Commonwealth*, 226 Va. 31, 307 S.E.2d 864 (1983), *cert. denied*, 465 U.S. 1109 (1984). Based on this review, we hold that Johnson's death sentence is neither excessive nor disproportionate to penalties imposed by other sentencing bodies in this Commonwealth, considering both the crime and the defendant.

## VIII. CONCLUSION

We find no reversible error in the circuit court's judgment. Having reviewed Johnson's death sentence under the provisions of Code § 17.1-313, we decline to commute the sentence of death. Accordingly, we will affirm the circuit court's judgment.

*Affirmed.*

36