**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

**No. 14-4**

---

ALFREDO PRIETO,

        Petitioner - Appellant,

    v.

DAVID ZOOK, Warden, Sussex I State Prison,

        Respondent - Appellee.

---

Appeal from the United States District Court for the Eastern District of Virginia, at Richmond. Henry E. Hudson, District Judge. (3:13-cv-00849-HEH)

---

Argued: May 13, 2015            Decided: June 30, 2015

---

Before MOTZ, SHEDD, and DIAZ, Circuit Judges.

---

Affirmed by published opinion. Judge Motz wrote the opinion, in which Judge Shedd and Judge Diaz joined.

---

**ARGUED:** Miriam Bamberger Airington, BOWEN, CHAMPLIN, FOREMAN & ROCKECHARLIE PLLC, Richmond, Virginia, for Appellant. Alice Theresa Armstrong, OFFICE OF THE ATTORNEY GENERAL OF VIRGINIA, Richmond, Virginia, for Appellee. **ON BRIEF:** Cary B. Bowen, BOWEN, CHAMPLIN, FOREMAN & ROCKECHARLIE PLLC, Richmond, Virginia, for Appellant. Mark R. Herring, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF VIRGINIA, Richmond, Virginia, for Appellee.

DIANA GRIBBON MOTZ, Circuit Judge:

Alfredo Rolando Prieto appeals the district court's denial of his petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. He contends that the Eighth Amendment prohibition on the execution of intellectually disabled persons, as set forth in Atkins v. Virginia, 536 U.S. 304 (2002), and Hall v. Florida, 134 S. Ct. 1986 (2014), renders his two death sentences unconstitutional. We affirm.

I.

In 2007, a Virginia jury convicted Prieto of two counts of capital murder, two counts of use of a firearm in the commission of murder, grand larceny, and rape. Prieto v. Commonwealth, 682 S.E.2d 910, 914 (Va. 2009) ("Prieto I").[1] Discovery of juror misconduct at the sentencing phase of the 2007 trial led to a mistrial, but in 2008, a second jury convicted Prieto on all counts. Id. at 913. During the sentencing phase of his second trial, Prieto argued that he was intellectually disabled and therefore ineligible for the death penalty under Atkins. Prieto introduced substantial evidence in support of his claim of intellectual disability, but the jury found that he was not

_____

[1] The crimes for which Prieto was convicted occurred in 1988, but Prieto was not linked to the murders until 2005, when DNA testing led police to identify him as a suspect. Prieto I, 682 S.E.2d at 915–16.

2

intellectually disabled and imposed the death penalty on the two murder counts.  Id. at 914, 916-17.

On direct appeal, the Supreme Court of Virginia affirmed Prieto's convictions but vacated his death sentences due to defects in the jury verdict forms at the penalty phase.  Id. at 935-36.  In 2010, on remand for resentencing of the capital murder convictions, a third jury unanimously recommended the death penalty for both murder convictions.  (Prieto did not argue that he was intellectually disabled at the resentencing.) The state trial court entered an order imposing the death penalty on both capital murder counts, and the Supreme Court of Virginia affirmed both sentences.  Prieto v. Commonwealth, 721 S.E.2d 484, 489 (Va.) ("Prieto II"), cert. denied, Prieto v. Virginia, 133 S. Ct. 244 (2012).

Prieto next filed a habeas petition with the Supreme Court of Virginia, raising several claims, including contentions that his counsel was constitutionally ineffective and that his execution was barred by Atkins.  See Prieto v. Warden of Sussex I State Prison, 748 S.E.2d 94, 105 (Va. 2013) ("Prieto III"). As relevant here, that court held that Prieto could not raise his Atkins claim in his state habeas petition because he had failed to raise the claim on direct appeal of the 2010 order imposing the death sentences.  Id.  Under Virginia law, that failure meant his Atkins claim had been procedurally defaulted.

3

Id. The state habeas court dismissed the remainder of Prieto's claims. Id. at 98.

Pursuant to 28 U.S.C. § 2254, Prieto then filed the present habeas application in federal court, again raising a number of claims. The district court dismissed most of Prieto's claims as meritless; it dismissed his Atkins claim as procedurally defaulted. We granted a certificate of appealability as to the Atkins claim.

## II.

"Construing and applying the Eighth Amendment in the light of our 'evolving standards of decency,'" the Supreme Court in Atkins held that "death is not a suitable punishment for a mentally retarded[2] criminal." 536 U.S. at 321 (citation omitted). However, acknowledging the difficulty "in determining which offenders are in fact retarded," the Court "le[ft] to the State[s] the task of developing appropriate ways to enforce the constitutional restriction" on the death penalty that it announced in Atkins. Id. at 317 (second alteration in original) (internal quotation marks and citation omitted).

---

[2] Later, the Supreme Court substituted the term "intellectual disability" for "mental retardation." Hall, 134 S. Ct. at 1990. We do the same, except when quoting from cases, statutes, and testimony that use the term "mentally retarded" and pre-date the Court's guidance in Hall.

4

Responding to this directive, Virginia enacted a statute defining "mentally retarded" as

> a disability, originating before the age of 18 years, characterized concurrently by
>
> (i) significantly subaverage intellectual functioning as demonstrated by performance on a standardized measure of intellectual functioning administered in conformity with accepted professional practice, that is at least two standard deviations below the mean and
>
> (ii) significant limitations in adaptive behavior as expressed in conceptual, social and practical adaptive skills.

Va. Code Ann. § 19.2-264.3:1.1(A).

Virginia's highest court interpreted this "two-fold test" to require, under the first prong, an IQ score of 70, "below which one may be classified as being mentally retarded." Johnson v. Commonwealth, 591 S.E.2d 47, 59 (Va. 2004), vacated and remanded on other grounds sub. nom., Johnson v. Virginia, 544 U.S. 901 (2005). In other words, the state court held that a defendant with an IQ score of 71 or higher could not be "mentally retarded" under Virginia law.

Last year, however, the Supreme Court clarified in Hall that a state that "seeks to execute a man because he scored a 71 instead of 70 on an IQ test. . . . misconstrues the Court's statements in Atkins." 134 S. Ct. at 2001. The Court deemed unconstitutional a Florida statute containing a "rigid rule" imposing IQ cutoffs for intellectual disability. Id. The Hall

5

Court explained that a state's assessment of a defendant's intellectual disability should focus on whether he evidenced, beginning "during the developmental period," both (1) "significantly subaverage intellectual functioning," and (2) "deficits in adaptive functioning (the inability to learn basic skills and adjust behavior to changing circumstances)." Id. at 1994. The Court emphasized that these two criteria are "interrelated" and that no "single factor [is] dispositive." Id. at 2001. Accordingly, "an individual with an IQ test score between 70 and 75 or lower may show intellectual disability by presenting additional evidence regarding difficulties in adaptive functioning." Id. at 2000 (internal quotation marks and citation omitted).

After Hall, it is clear that the Supreme Court of Virginia's prior interpretation of the first prong of the Virginia statute violates the Eighth Amendment. The Hall Court said as much, identifying Virginia as one of only two states to "have adopted a fixed [IQ] score cutoff identical to Florida's." Id. at 1996. Hall established that a state may not deny a defendant the opportunity to establish his intellectual disability based on evidence of "deficits in adaptive functioning over his lifetime," simply because that defendant has an IQ score above 70. Id. at 2001. But the fact that Virginia operated under an unconstitutional definition of

6

"intellectual disability" at the time of Prieto's sentencing does not resolve the Atkins inquiry if, as the state habeas court and the district court held, Prieto has procedurally defaulted that claim. We therefore turn first to that question.

III.

A.

Federal courts "will not review a question of federal law decided by a state court" if the state court's decision rests on an independent and adequate state law ground. Coleman v. Thompson, 501 U.S. 722, 729-30 (1991). When a state habeas court declines to address a prisoner's federal constitutional claims "because the prisoner had failed to meet a state procedural requirement[,] . . . the state judgment rests on independent and adequate state procedural grounds." Id. at 730. In these circumstances, "concerns of comity and federalism" dictate against a federal court's review of that judgment. Id.

In reviewing Prieto's state habeas petition, the Supreme Court of Virginia determined that he had procedurally defaulted his Atkins claim because he could have raised it on direct review of his 2010 sentence but had failed to do so. See Prieto III, 748 S.E.2d at 105. The court explained that, under the procedural rule established by Slayton v. Parrigan, 205 S.E.2d 680, 682 (Va. 1974), a "non-jurisdictional issue [that] could

7

have been raised during the direct appeal process . . . is not cognizable in a petition for a writ of habeas corpus." Prieto III, 748 S.E.2d at 105. We previously have held that this precise Virginia procedural default rule constitutes an independent and adequate state ground for a denial of a state habeas petition. See Mu'Min v. Pruett, 125 F.3d 192, 196-97 (4th Cir. 1997).

In this appeal, Prieto does not challenge the Supreme Court of Virginia's determination that he defaulted his Atkins claim. That is, he does not argue that he actually did raise his Atkins claim on direct review. As such, Prieto's Atkins claim is procedurally defaulted, and he is ineligible for relief unless one of the two exceptions to procedural default applies. See Hedrick v. True, 443 F.3d 342, 366 (4th Cir. 2006). Prieto asserts that an exception to procedural default saves his Atkins claim.

B.

A habeas petitioner can rescue his constitutional claim from procedural default if he establishes either "cause and prejudice" for the default or that the default would yield a "fundamental miscarriage of justice." Mackall v. Angelone, 131 F.3d 442, 445 (4th Cir. 1997) (citing Harris v. Reed, 489 U.S. 255, 262 (1989)). In his § 2254 petition before the district court, Prieto argued that both exceptions applied to his case.

8

Because constitutionally ineffective assistance of counsel may provide "cause" for a procedural default, Prieto argued that his counsel's failure to present evidence of his intellectual disability at his 2010 resentencing constituted such ineffective assistance. See Murray v. Carrier, 477 U.S. 478, 488 (1986). The district court, however, found Prieto's ineffective assistance claim meritless, and so held that Prieto had failed to show "cause and prejudice" excusing the procedural default. Prieto does not challenge that ruling in this appeal. As a result, the only way Prieto's Atkins claim survives his procedural default is through a showing that enforcing the default would result in a "fundamental miscarriage of justice." See Smith v. Murray, 477 U.S. 527, 537-38 (1986).

The Supreme Court has explained that a "fundamental miscarriage of justice" occurs "where a constitutional violation has probably resulted in the conviction of one who is actually innocent." Carrier, 477 U.S. at 496. The Court later clarified in Sawyer v. Whitley, 505 U.S. 333, 341 (1992), that "actual innocence" may also mean "innocent of death" in the sentencing context. This means that in a capital case, a habeas petitioner can make a showing of "actual innocence," and qualify for the exception, by proving through "clear and convincing evidence that, but for a constitutional error, no reasonable juror would

have found the petitioner eligible for the death penalty under the applicable state law."  Id. at 336.

Prieto does not argue that he is actually innocent of the crimes for which he was convicted.  Rather, he argues only that he is "innocent of death."  Thus, for us to excuse his procedural default, Prieto must show that, if instructed properly under Hall and Atkins, "no reasonable juror" could have found him eligible for the death penalty under Virginia law. This presents an extremely high bar.[3]


IV.

Prieto rests his claim of actual innocence on the Supreme Court's decision in Hall.  Neither we nor the Supreme Court has determined whether Hall applies retroactively to cases on collateral review.[4]  For purposes of Prieto's "actual innocence" inquiry we will assume without deciding, as the district court

---

[3] Indeed, the "clear and convincing evidence" standard for establishing "actual innocence" in the capital sentencing context is "more stringent" than the standard for establishing "actual innocence" of the conviction itself. Schlup v. Delo, 513 U.S. 298, 326-27 (1995).  The latter requires only a showing that "a constitutional violation has probably resulted in the conviction of one who is actually innocent."  Id. at 327 (internal quotation marks and citation omitted).

[4] The two federal appellate courts that have ruled on this question to date have held, over dissents, that Hall does not apply retroactively on collateral review. See In re: Henry, 757 F.3d 1151, 1161 (11th Cir. 2014); Goodwin v. Steele, 2014 U.S. App. LEXIS 23149 (8th Cir. 2014) (per curiam).

10

did, that <u>Hall</u> does apply retroactively on collateral review. Under this assumption, the district court concluded that "Prieto has not shown by clear and convincing evidence that no reasonable juror would have sentenced him to death because he is intellectually disabled." We review the denial of Prieto's habeas application de novo. <u>Hedrick</u>, 443 F.3d at 349.

The only evidence that Prieto points to in support of his "actual innocence" claim is the evidence introduced at the sentencing hearing following his 2008 conviction.[5] At that hearing, both Prieto and the Commonwealth offered a good deal of evidence as to both prongs of Virginia's statute: intellectual functioning and adaptive functioning. In his § 2254 petition, Prieto focuses on the adaptive functioning evidence.

That evidence included the testimony of multiple expert witnesses. Prieto's chief witness, Dr. Ricardo Weinstein, a forensic neuropsychologist with expertise in brain development, conducted "a comprehensive evaluation of Mr. Prieto's neuropsychological functioning" and adaptive functioning. He explained that adaptive functioning includes occupational

---

[5] Prieto and the Commonwealth filed a joint appendix in Prieto's direct appeal of his 2008 conviction and sentencing, <u>Prieto I</u>. We quote from and rely on the materials in that joint appendix in discussing the evidence presented at Prieto's 2008 sentencing.

11

skills, activities of daily living, self-esteem, interpersonal abilities, self-direction, language, and academic abilities.

Dr. Weinstein's evaluation of Prieto's adaptive functioning included interviews with Prieto's relatives in California and El Salvador. He also interviewed individuals from the El Salvadorian government "to understand more about what was going on in the country" when Prieto was a child. Prieto "was described as a shy and withdrawn child in adolescence," and "as having problems learning simple tasks." Interviewees told Dr. Weinstein that Prieto "was easily manipulated by relatives and friends"; kids his age "did not like to play with him because . . . he couldn't understand the rules"; and he had "problems acquiring academic skills" and "problems controlling his emotions." Dr. Weinstein also spent "between twenty and thirty hours" over a number of visits with Prieto, administered tests to assess Prieto's behavioral skills, and examined the records kept by California prisons on Prieto.

Dr. Weinstein stated that his research uncovered many risk factors for adaptive functioning deficits throughout Prieto's childhood. In El Salvador, Prieto grew up in extreme poverty, characterized by poor nutrition, a lack of running water, and little cognitive stimulation. He suffered abuse from his alcoholic father and abandonment by his mother, and he had to contend with uncertainty as a result of wars in El Salvador, as

12

well as witnessing his grandfather's shooting death. After Prieto moved to California as a teenager, he began abusing drugs and alcohol, was often in trouble with the law, and married his pregnant girlfriend at a young age. Ultimately, Dr. Weinstein opined that Prieto "had adaptive behavior deficits . . . during his developmental years." He also opined that Prieto's neurological testing revealed "a brain dysfunction" affecting areas of the brain "that deal with judgment, deal with being able to foresee consequences of behaviors, control sexuality, control aggression, . . . [and] are responsible[] for . . . empathy."

Other witnesses for Prieto offered similar testimony. Psychiatrist Dr. Pablo Stewart testified that after meeting with Prieto, he concluded that Prieto "suffers from post trauma stress disorder[,] . . . has impaired cognitive functioning, and . . . has a history of chronic polysubstance dependence." Neuropsychiatrist Dr. James Merikangas testified that Prieto's brain scans revealed damage to the areas of the brain that "control one's emotions, [and] control one's impulses." Members of Prieto's family, including his mother and siblings, testified about the harsh conditions of Prieto's childhood and about his early development. Hence, Prieto's defense at his 2008 sentencing included testimony from a wide array of sources about the limits of his adaptive functioning.

13

At the same time, however, the Commonwealth also presented extensive evidence that Prieto's adaptive functioning was not deficient. The jury heard from the prosecution that three prison psychologists had evaluated Prieto when he was incarcerated in California and that each had concluded that he was not intellectually disabled. One of these psychologists reported that Prieto's "cognitive functions were adequately developed, and that his level of conceptual thinking and reasoning were adequate for the formation of good judgement [sic]." The jury learned that Prieto had written his own prison grievances challenging his lack of access to recreation and had filed a pro se legal challenge to the conditions of his confinement on Virginia's death row. In these documents, Prieto employed accurate legal terminology and to prepare them, he conducted self-directed legal research. The jury received copies of Prieto's elementary and high school report cards indicating that he mostly received grades of "good" and "very good." The jury was reminded that Prieto acted alone in his crimes, and that he had exhibited leadership abilities when committing prior crimes.

The prosecution offered its own key witness, clinical and forensic psychologist Dr. Leigh Hagan, who interviewed Prieto and reviewed past reports on him by prison officials, Dr. Weinstein, and Dr. Merikangas. Dr. Hagan testified that

14

Prieto understood the structure of jail, had a fairly sophisticated vocabulary, could cogently discuss foreign policy and political issues, could speak both English and Spanish, and did not exhibit significant limitations in his conceptual or social skills. The doctor cited evidence that Prieto could engage respectfully with others, could work within social networks, had been involved in intimate interpersonal relationships, and could perform daily mathematical and analytical tasks without difficulty.

Dr. Hagan further highlighted evidence that Prieto had been able to obtain driver's licenses in Virginia and California, secure employment, operate power equipment, fly cross-country, arrange his own housing, negotiate the purchase of a car, and employ aliases to avoid detection. He noted that Prieto could explain "why it was important to have his hair cut for court," because "he understood the value of creating a good impression," reflecting his social awareness. Ultimately, Dr. Hagan concluded that Prieto's "adaptive functioning falls above the threshold of significant limitations," because of his "conceptual reasoning, [his] social capacity, and his practical skill."

In short, although Prieto offered evidence of poor adaptive functioning, the Commonwealth also offered compelling evidence refuting the existence of any adaptive deficits. Prieto does

15

not contend that, were he resentenced, he would seek to present additional evidence of deficits in his adaptive functioning that he did not present at his 2008 sentencing. As a result, we are left to conclude that a jury at resentencing would face much of the same evidence. Absent some new "smoking gun," evidence of Prieto's adaptive functioning deficits is at best inconclusive. Consequently, Prieto cannot clear the high "actual innocence" threshold. Prieto simply cannot establish that <u>no</u> reasonable juror, faced with all of this evidence as to his adaptive functioning, would find him eligible for the death penalty -- even if the jury were instructed properly under <u>Hall</u>.

Perhaps because of this, Prieto argues that the evidence he has already presented is similar to the evidence Hall offered to prove his intellectual disability. But that comparison fails. First, the <u>Hall</u> Court never concluded that Hall was intellectually disabled, so it is unclear how any similarities aid Prieto in establishing his own disability. In fact, instructing that, on remand, Hall should be permitted to present evidence of defects in his adaptive functioning, the Supreme Court expressly noted that Hall "may or may not be intellectually disabled." <u>Hall</u>, 134 S. Ct. at 2001. Moreover, even were Prieto's case like Hall's, Prieto is subject to a much higher burden of proof because of his procedural default. Hall did not have to prove he was "actually innocent" of the death

16

penalty <u>before</u> the Court could consider the merits of his Eighth Amendment claim; Prieto does.

On the record before us, we cannot conclude that after <u>Hall</u>, no reasonable juror would find Prieto eligible for the death penalty. For, "[t]o say that no reasonable juror" would have found Prieto eligible for a death sentence, "we would have to ignore the totality of evidence," which included significant evidence that his adaptive functioning is not deficient. <u>Calderon v. Thompson</u>, 523 U.S. 538, 565 (1998). And absent a showing that he is "actually innocent" of the death penalty, Prieto cannot overcome the procedural default that bars consideration on the merits of his <u>Atkins</u> claim.[6]

---

[6] <u>Brumfield v. Cain</u>, No. 13-1433, 576 U.S. -- (June 18, 2015), issued after oral argument in this case, does not affect our holding. The Supreme Court limited its holding in <u>Brumfield</u> to an application of Louisiana law to the evidence presented in that case. The Court did not purport to alter its prior teachings about intellectual disability, procedural default, or the actual innocence exception. Rather, the Court simply held that the state habeas court's refusal to grant Brumfield an evidentiary hearing on his intellectual disability claim, as permitted by Louisiana law, was based on "an unreasonable determination of the facts" within the meaning of 28 U.S.C. § 2254(d)(2). Brumfield, however, had not procedurally defaulted his claim of intellectual disability under <u>Atkins</u>. Thus, unlike Prieto, he did not have to prove that he was actually innocent of the death penalty before a federal habeas court could consider the merits of that claim. Prieto's procedural default forces him to satisfy this high standard of proof, and <u>Brumfield</u> in no way disturbs our conclusion that he has failed to do so.

17

V.

The "fundamental miscarriage of justice" exception to procedural default imposes a "demanding" burden on habeas petitioners challenging their death sentences.  Id. at 559.  It provides a basis for relief only in "extraordinary instances." McCleskey v. Zant, 499 U.S. 467, 494 (1991).  Prieto has failed to establish that this path around procedural default is open to him.  Accordingly, the judgment of the district court is

AFFIRMED.

18