Present:  All the Justices

WILLIAM WILTON MORRISETTE, III

OPINION BY
v. Record Nos. 020323 & 020324    JUSTICE CYNTHIA D. KINSER
SEPTEMBER 13, 2002
COMMONWEALTH OF VIRGINIA

FROM THE CIRCUIT COURT OF THE CITY OF HAMPTON
William C. Andrews, III, Judge

A jury convicted William Wilton Morrisette, III, of the 1980 rape and capital murder of Dorothy M. White.  At the conclusion of the penalty phase of a bifurcated trial, the jury fixed Morrisette's punishment at death on the capital murder charge and at life imprisonment on the rape charge.  The jury based its sentence of death on findings of both "future dangerousness" and "vileness."  See Code § 19.2-264.2.  The trial court sentenced Morrisette in accordance with the jury verdict.

We have consolidated the automatic review of Morrisette's death sentence with his appeal of the capital murder conviction.  Code § 17.1-313(F).  We have also certified Morrisette's appeal of his rape conviction from the Court of Appeals and consolidated that appeal with the appeal of the capital murder conviction.  Code § 17.1-409.  After considering the issues raised in Morrisette's assignments of error and conducting our mandated review pursuant to Code § 17.1-313(C), we find no error in the

judgments of the circuit court. Accordingly, we will affirm Morrisette's convictions for rape and capital murder, in violation of Code §§ 18.2-61 and 18.2-31(5), respectively, and his sentence of death.

## I. FACTS

In accordance with well-established principles, we state the evidence in the light most favorable to the Commonwealth, the prevailing party at trial. Bell v. Commonwealth, 264 Va. 172, 178, 563 S.E.2d 695,701 (2002) (citing Burns v. Commonwealth, 261 Va. 307, 313, 541 S.E.2d 872, 877, cert. denied, ___ U.S. ___, 122 S.Ct. 621 (2001); Jackson v. Commonwealth, 255 Va. 625, 632, 499 S.E.2d 538, 543 (1998), cert. denied, 525 U.S. 1067 (1999); Roach v. Commonwealth, 251 Va. 324, 329, 468 S.E.2d 98, 101, cert. denied, 519 U.S. 951 (1996)). We also accord the Commonwealth the benefit of all inferences fairly deducible from the evidence. Id. (citing Higginbotham v. Commonwealth, 216 Va. 349, 352, 218 S.E.2d 534, 537 (1975)).

## A. GUILT PHASE

When Dorothy White did not report for work on the morning of July 25, 1980, two of her co-workers became concerned and went to her house trailer, located on Pine Needle Road in the City of Hampton, to check on her

2

welfare.  Upon entering the trailer, they found White's body lying on the kitchen floor.  Her blouse and bra were pulled up, exposing her breasts; she was otherwise nude. Her throat had been cut, and she had sustained several other wounds.  A "milky-looking substance [that] appeared to be wet" was visible on her pubic hair.  The kitchen was splattered with blood, but there were no signs of a struggle in any other portion of White's home nor any evidence of a forced entry into the dwelling.

An autopsy was performed the next day, during which samples of White's hair, blood, and body fluids were collected from her body by using a Physical Evidence Recovery Kit (PERK).  Testing of those samples revealed the presence of intact sperm on the swabs taken from White's vulva, vagina, and cervix; only a sperm head was found on the anal swab.  The autopsy documented that White had suffered a slash wound across her throat, which totally severed her trachea, the right carotid artery, the jugular vein, and certain muscles in her neck; the wound partially severed the esophagus.  White had also sustained a stab wound to her neck; three stab wounds to her chest, one of which penetrated her heart; and stab wounds to her abdomen and flank, for a total of eight stab wounds.  Additional

defensive wounds on her hands and legs indicated that White had attempted to ward away the knife blows.

Several of the wounds individually could have caused White's death, but the slash wound to her throat was "fatal within minutes." However, despite the lethal nature of that wound, it did not render White instantly unconscious. Dr. Faruk B. Presswalla, the forensic pathologist who performed the autopsy, testified that because the trachea, or windpipe, was cut, much of the flowing blood traveled down that airway. He described the effect as "sort of like drowning in your own blood." The time of death was estimated at approximately 11:30 p.m. on the night before White's co-workers discovered her body.

In the days following the murder, police officers interviewed several individuals as possible suspects, including Morrisette. Morrisette acknowledged that he knew White through his employer, Albert "Bill" Anthony, who was White's "boyfriend," and that he had previously washed White's automobile when she brought it to Anthony's "car lot." Morrisette had also accompanied Anthony to White's residence on two occasions, once to perform yard work and the second time to pick up a stereo. When Morrisette was questioned concerning his whereabouts on the night in question, he stated that he had gone to Fertitta's

4

Restaurant, where he had consumed hot dogs and beer.  He stated that after eating, he walked to the Grandview Fishing Pier, talked with several people who were fishing, and drank another beer.  According to Morrisette, he then went to the Circle Inn around 10:00 p.m. and stayed there until 2:00 a.m. the following morning.  He told the police that, although his sister lived in an apartment above the Circle Inn, he did not go to her apartment when he left the Circle Inn, but instead slept in an old Dodge pick-up truck in the parking lot of the Circle Inn.  He said that he awoke around 9:00 or 10:00 a.m. the next morning, returned to the Circle Inn, and drank with a person who lived in a trailer park across the street from the Circle Inn.

The murder investigation became stalled, and no one was charged with the crime until 19 years later, when a DNA profile extracted from sperm retrieved from the cervix and vulva swabs of White's body was entered into the Virginia Forensic Laboratory's DNA databank.[1]  A search in the databank revealed that Morrisette's DNA profile[2] was a "cold

---

[1] In a training session concerning the DNA databank, the Hampton Police Department had been asked to submit "cold cases" for retesting.

[2] The record does not reflect when Morrisette's DNA profile was put into the Virginia Forensic Laboratory's DNA databank.  However, on brief, Morrisette states that his

hit" match with the DNA profile recovered in the PERK samples taken from White. As a result, a search warrant was obtained for a sample of Morrisette's blood, and additional testing using that sample confirmed that the DNA profile extracted from the sperm recovered from the victim was consistent with Morrisette's DNA profile.[3] According to David A. Pomposini, who testified at trial as an expert in the field of forensic biology, the probability of randomly selecting an unrelated individual other than Morrisette with a DNA profile matching the DNA profile of the sperm recovered from the cervix swabs of the victim is one in 900 million in the Caucasian population, one in 1.2 billion in the Black population, and one in 800 million in the Hispanic population.[4]

B. PENALTY PHASE

In the penalty phase of the trial, the Commonwealth introduced photographs of the victim as evidence of the vileness of the murder. The Commonwealth also argued that

_____

DNA profile was entered in connection with his convictions on charges of abduction and maiming in 1986.

[3] Arrest warrants charging Morrisette with rape and first degree murder were obtained simultaneously with the search warrant. A grand jury subsequently indicted Morrisette for rape and capital murder.

[4] Morrisette is a member of the Caucasian population.

6

Morrisette was a future danger to society, introducing evidence of his previous convictions for abduction and maiming in 1986, for burglary in 1984, and for driving under the influence of alcohol in 1999.

The victim of the prior abduction and maiming testified that Morrisette had attacked her as she sat in a car parked outside a high school, waiting for her daughter to emerge from band practice. He had a knife and pushed her down onto the car seat, trying to gag her. Morrisette cut her jawbone and neck, fleeing only when other vehicles approached.

In mitigation, Morrisette and the Commonwealth stipulated that, according to a deputy at the regional jail where Morrisette had been incarcerated prior to trial, Morrisette was a model inmate with a positive attitude. Morrisette's daughter and sister testified as to his affection for his family.[5]

## II. ANALYSIS

### A. PRE-TRIAL AND TRIAL ISSUES

#### 1. SPEEDY TRIAL

Morrisette claims that the delay between the time of

---

[5] We will summarize additional facts and material proceedings when necessary to address specific issues raised on appeal.

the offense in 1980 and his arrest in August 1999 violated his due process rights under both the Constitution of the United States and the Constitution of Virginia. In the statement that Morrisette gave to the police shortly after the murder, he provided details concerning his whereabouts on the evening in question, including names, addresses, and telephone numbers of putative corroborating witnesses. Testimony at trial established that the police never made any attempt to confirm Morrisette's alleged alibi after he provided that information. Morrisette asserts that, as a result of the pre-indictment delay, he was unable to locate the people who could have corroborated his version of his activities on the evening when White was murdered.

To buttress his claim of prejudice because of the pre-indictment delay, Morrisette also relies on the fact that, in 1985, White's PERK samples were resubmitted to the forensic laboratory for testing against Morrisette's PERK samples collected in connection with the abduction and maiming charges. However, Morrisette's PERK was never submitted to the laboratory, and the Hampton Police Department eventually directed that White's PERK be returned without any additional testing.

In denying Morrisette's motion to dismiss the indictments because of the pre-indictment delay, the trial

8

court concluded that both the Commonwealth and Morrisette had probably experienced some actual prejudice because of the death of witnesses since White's murder.  However, the court determined that a defendant has the burden to establish that the delay was intentional and used by the Commonwealth to gain a tactical advantage, and concluded that Morrisette had not carried that burden in this case. We agree with the trial court's conclusions.

It is important at the outset to point out that the type of delay about which Morrisette complains is pre-indictment delay, not post-indictment delay.  Thus, the Speedy Trial Clause of the Sixth Amendment is inapplicable. United States v. Lovasco, 431 U.S. 783, 788-89 (1977); Hall v. Commonwealth, 8 Va. App. 526, 528-29, 383 S.E.2d 18, 20 (1989).  Instead, the Due Process Clause is the source of constitutional protection against oppressive pre-indictment delay, but even that clause has a limited role to play in such situations.  Lovasco, 431 U.S. at 789.

"[P]roof of prejudice is generally a necessary but not sufficient element of a due process claim, and . . . the due process inquiry must consider the reasons for the delay as well as the prejudice to the accused."  Id. at 790 (citing United States v. Marion, 404 U.S. 307, 324-25 (1971)).  Thus, to gain dismissal of criminal charges

9

because of pre-arrest or pre-indictment delay, a defendant must establish that "(1) the prosecutor intentionally delayed indicting [the defendant] to gain a tactical advantage and (2) the defendant incurred actual prejudice as a result of the delay."  United States v. Amuny, 767 F.2d 1113, 1119 (5th Cir. 1985); accord United States v. Gouveia, 467 U.S. 180, 192 (1984) (citing Lovasco, 431 U.S. at 789-90; Marion, 404 U.S. at 324).  See also United States v. Lebron-Gonzalez, 816 F.2d 823, 831 (1st Cir.), cert. denied, 484 U.S. 843 (1987); United States v. Cornielle, 171 F.3d 748, 752 (2d Cir. 1999); United States v. Ismaili, 828 F.2d 153, 166-68 (3d Cir. 1987), cert. denied, 485 U.S. 935 (1988); United States v. Rogers, 118 F.3d 466, 474-75 (6th Cir. 1997); United States v. Stierwalt, 16 F.3d 282, 285 (8th Cir. 1994); United States v. Hayes, 40 F.3d 362, 365 (11th Cir. 1994), cert. denied, 516 U.S. 812 (1995).  The defendant bears the burden of proving both actual prejudice and improper purpose.  Cornielle, 171 F.3d at 752; accord Ismaili 828 F.2d at 167; Amuny, 767 F.2d at 1119; Hayes, 40 F.3d at 365.

In the present case, we hold that Morrisette failed to establish that the Commonwealth intentionally delayed arresting or indicting him in order to gain a tactical advantage.  Morrisette concedes that there is no direct

evidence to prove this element of the two-part test. Nevertheless, he argues that an improper motive can be inferred from the fact that the requested comparison testing of White's and Morrisette's respective PERK samples was not completed in 1985 and because of the police department's "willful failure" to verify the statement Morrisette gave a few days after White's murder. We do not agree. The evidence demonstrates that the police investigated several possible suspects and that the focus of the investigation simply shifted to persons other than Morrisette. Thus, the trial court did not err in denying Morrisette's motion to dismiss the indictments because of the pre-indictment delay. Morrisette's due process rights under the Constitution of the United States and the Constitution of Virginia were not violated by the delay. See Willis v. Mullett, 263 Va. 653, 657, 561 S.E.2d 705, 708 (2002) (due process protections afforded under the Constitution of Virginia are co-extensive with those of the federal constitution).

## 2. JURY SELECTION

Morrisette challenges the trial court's rulings with regard to two jurors. He claims that the court erred by striking juror Cooper for cause and by failing to excuse

11

juror Johnson for cause. We find no merit in either of these assignments of error.

First, as to juror Cooper, the trial court excused her because she indicated that she could not consider imposing the death penalty under any circumstances. The following excerpt from the voir dire of this juror illustrates her position regarding the death penalty:

> [COMMONWEALTH'S ATTORNEY]: Miss Cooper, I asked you a couple of minutes ago if you were selected as the foreman of the jury and the jury found the Defendant guilty of capital murder, um, would you be able to sign your name to a verdict form setting forth the jury sentence if that verdict was a death sentence, and you indicated that you had some difficulty with that.
>
> JUROR COOPER: Yes, I did.
>
> [COMMONWEALTH'S ATTORNEY]: Do you have difficulty with imposing the imposition of the death penalty? Is that something difficult for you?
>
> JUROR COOPER: Yes.
>
> [COMMONWEALTH'S ATTORNEY]: Okay. Is it something that you would have a hard time considering in this or –
>
> JUROR COOPER: Yes.
>
> [COMMONWEALTH'S ATTORNEY]: – any other case?
>
> JUROR COOPER: Yes.
>
> [COMMONWEALTH'S ATTORNEY]: All right. Thank you.
>
> [DEFENSE COUNSEL]: Miss Cooper, if you were on the jury and the Judge advised you to consider

12

all the evidence in the case that includes guilt or innocence and also includes as a possible punishment . . . the death penalty, even though you would have some hesitancy, could you still fairly consider that in arriving at your verdict in this case?

JUROR COOPER: No, I don't think I would be able to.

[DEFENSE COUNSEL]: Not under any circumstance as to the death penalty?

JUROR COOPER: I feel like I could not. I would not be able to.

[DEFENSE COUNSEL]: Okay. Thank you, your Honor.

Regarding juror Johnson, Morrisette moved to excuse this juror because, on the morning of trial, Johnson had read a newspaper article containing information about White's murder and Morrisette's prior conviction for maiming. Juror Johnson also had some independent recollection of the occurrence of White's murder. When asked if his memory coupled with the newspaper article had "put facts in [his] mind that would stay with [him] through the course of this trial[,]" juror Johnson responded:

That would be a little hard to answer, sir. Of course, it would, you know, my memories and reading the paper, but I think that I would listen to the witnesses and just disregard what I've seen or heard up to this point . . . and just listen to the witnesses. I think so.

The trial court denied Morrisette's motion to excuse Johnson, concluding that Johnson was simply being honest in

13

his response and that he could listen to the evidence with an open mind.

Upon appellate review, we give deference to a trial court's determination regarding whether to excuse or retain a prospective juror "because the trial judge has observed and heard each member of the venire and is in a superior position to evaluate whether the juror's responses during voir dire develop anything that would prevent or substantially impair the juror's performance of duty as a juror in accord with the court's instructions and the juror's oath."  Vinson v. Commonwealth, 258 Va. 459, 467, 522 S.E.2d 170, 176 (1999), cert. denied, 530 U.S. 1218 (2000).  In doing so, we consider a juror's entire voir dire, not just isolated parts.  Mackall v. Commonwealth, 236 Va. 240, 252, 372 S.E.2d 759, 767 (1988), cert. denied, 492 U.S. 925 (1989).  Absent a showing of manifest error, we will affirm a trial court's decision to exclude or retain a juror.  Vinson, 258 Va. at 467, 522 S.E.2d at 176.

We do not find manifest error in the trial court's decisions regarding jurors Cooper and Johnson.  Cooper stated unequivocally, in response to a question by Morrisette's counsel, that she would not be able to consider imposing the death penalty under any circumstances.  Johnson stated that the newspaper article

14

he read on the morning of trial would not affect his judgment, that he could remain impartial, and that he could base his decision solely on the evidence presented in the courtroom, disregarding anything that he had seen or heard previously.  Thus, we conclude that the trial court did not abuse its discretion in excluding juror Cooper and retaining juror Johnson.

### 3. SUFFICIENCY OF EVIDENCE OF RAPE

At the conclusion of the Commonwealth's evidence in the guilt phase of the trial, Morrisette moved to strike that evidence as to the charge of rape and, thus, also as the underlying predicate for the capital murder charge. Morrisette claimed, as he does on appeal, that the Commonwealth failed to prove nonconsensual intercourse by the use of force.[6]  Morrisette points to Dr. Presswalla's testimony at trial that there were no injuries in White's genital area and seeks to disconnect the rape from the murder by relying on Dr. Presswalla's testimony that intact sperm inside the vagina can be identified for up to 26 hours after a sexual act.  He also relies on the fact that other people had access to White's residence, including her

---

[6] In 1980, when the offense was committed, the provisions of Code § 18.2-61 required proof that the sexual intercourse occurred against the victim's will and through

15

"boyfriend," Albert Anthony, who had called White's co-workers and asked them to check on White when she did not come to work on the morning that her body was eventually discovered.

Viewing the evidence in the light most favorable to the Commonwealth, the trial court denied the motion, finding that the question whether White had been raped was a jury issue. We agree and conclude that the trial court did not err in refusing to strike the Commonwealth's evidence of rape.

In contrast to the testimony emphasized by Morrisette, Dr. Presswalla stated that the absence of genital injury is not unusual in a sexual assault case when a weapon is involved. He further explained that, in this case, semen was also recovered from the vulva, and he opined that it was most unlikely that semen would have remained on the surface of the victim's external genitals for several hours unless she had been incapacitated during that time. Dr. Presswalla also testified that the knife wounds were sustained not long after the semen was deposited. Those multiple knife wounds included the slashing of White's throat and several defensive wounds sustained while she was

the use of force. The use of threat or intimidation is included in the present version of Code § 18.2-61.

16

trying to ward off her attacker.  Furthermore, her clothes were in disarray, with most of her body nude.  These facts are sufficient to support the defendant's conviction for rape and the use of that conviction as the predicate offense for the capital murder conviction.  See Johnson v. Commonwealth, 259 Va. 654, 682, 529 S.E.2d 769, 785 (15 stab wounds and other injuries demonstrated that victim did not consent to sexual intercourse), cert. denied, 531 U.S. 981 (2000).

## B. ISSUES PREVIOUSLY DECIDED

On appeal, Morrisette raises several issues that this Court has already decided adversely to the position he espouses.  In fact, Morrisette's counsel acknowledged during oral argument that all the following issues have been resolved by this Court, but asked, nevertheless, that we reconsider our prior decisions.  However, we find no reason to depart from our precedent.  Thus, we reaffirm our prior holdings and reject the following arguments:

1. Imposition of the death penalty violates the Eighth Amendment's prohibition against cruel and unusual punishment.  Rejected in Johnson, 259 Va. at 667, 529 S.E.2d at 776; Jackson v. Commonwealth, 255 Va. at 635, 499 S.E.2d at 545; Goins v. Commonwealth, 251 Va. 442, 453, 470 S.E.2d 114, 122, cert. denied, 519 U.S. 887 (1996); Spencer

17

v. Commonwealth, 238 Va. 563, 568-69, 385 S.E.2d 850, 853 (1989), cert. denied, 493 U.S. 1093 (1990).

2. Virginia's two statutory aggravating factors, "vileness" and "future dangerousness," are unconstitutionally vague on their face and as applied, and thus fail to guide the jury's exercise of discretion. Rejected in Beck v. Commonwealth, 253 Va. 373, 387, 484 S.E.2d 898, 907, cert. denied, 522 U.S. 1018 (1997); Clagett v. Commonwealth, 252 Va. 79, 86, 472 S.E.2d 263, 267 (1996), cert. denied, 519 U.S. 1122 (1997); Williams v. Commonwealth, 248 Va. 528, 535-36, 450 S.E.2d 365, 371 (1994), cert. denied, 515 U.S. 1161 (1995); Breard v. Commonwealth, 248 Va. 68, 74-75, 445 S.E.2d 670, 675, cert. denied, 513 U.S. 971 (1994).

3. Use of the defendant's prior convictions to establish "future dangerousness" and to impose the death penalty violates the constitutional protection against double jeopardy. Rejected in Joseph v. Commonwealth, 249 Va. 78, 82, 452 S.E.2d 862, 865, cert. denied, 516 U.S. 876 (1995); Yeatts v. Commonwealth, 242 Va. 121, 126, 410 S.E.2d 254, 258 (1991), cert. denied, 503 U.S. 946 (1992); Watkins v. Commonwealth, 238 Va. 341, 352, 385 S.E.2d 50, 56 (1989), cert. denied, 494 U.S. 1074 (1990).

18

4. Virginia's jury instructions regarding mitigating evidence do not provide meaningful guidance to the jury because the instructions do not inform the jurors that they have a duty to consider mitigating evidence, do not provide any standard of proof regarding mitigating evidence, do not state that the death penalty can be imposed only if the jury is convinced beyond a reasonable doubt that aggravating factors outweigh mitigating ones, do not advise jurors that they are free to give mitigating evidence the weight and effect that each juror believes is appropriate, do not list the statutory examples of mitigating evidence, and do not define the terms "fairness" and "mercy."[7] Rejected in Buchanan v. Angelone, 522 U.S. 269, 275-77 (1998); Cherrix v. Commonwealth, 257 Va. 292, 299, 513 S.E.2d 642, 647, cert. denied, 528 U.S. 873 (1999); Breard, 248 Va. at 74, 445 S.E.2d at 674-75; Swann v. Commonwealth, 247 Va. 222, 228, 441 S.E.2d 195, 200, cert. denied, 513 U.S. 889 (1994); Satcher v. Commonwealth, 244 Va. 220, 228, 421 S.E.2d 821, 826 (1992), cert. denied, 507 U.S. 933

---

[7] We note that the instructions given to the jury during the penalty phase of the trial provided that the jury "shall consider any mitigation evidence," that "a mitigating factor is one that would tend to favor a sentence of . . . imprisonment for life," and that such evidence does not have to be proven beyond a reasonable doubt.

19

(1993); <u>Watkins v. Commonwealth</u>, 229 Va. 469, 490-91, 331 S.E.2d 422, 438 (1985), <u>cert. denied</u>, 475 U.S. 1099 (1986).

5. Virginia does not provide meaningful appellate review in death penalty cases because of the expedited review procedure and because this Court does not consider all capital murder cases, including those not appealed to the Court, in conducting its proportionality review. Rejected in <u>Emmett v. Commonwealth</u>, No. 020314, 264 Va. ___, ___, ___ S.E.2d ___, ___ (2002) (this day decided); <u>Lovitt v. Commonwealth</u>, 260 Va. 497, 509, 537 S.E.2d 866, 874 (2000), <u>cert. denied</u>, ___ U.S. ___, 122 S.Ct. 41 (2001); <u>Bailey v. Commonwealth</u>, 259 Va. 723, 740-42, 529 S.E.2d 570, 580-81, <u>cert. denied</u>, 531 U.S. 995 (2000); <u>Goins</u>, 251 Va. at 453, 470 S.E.2d at 122.

6. Morrisette was entitled to expanded discovery beyond the scope of Rule 3A:11. Rejected in <u>Walker v. Commonwealth</u>, 258 Va. 54, 63, 515 S.E.2d 565, 570-71 (1999), <u>cert. denied</u>, 528 U.S. 1125 (2000); <u>Strickler v. Commonwealth</u>, 241 Va. 482, 490-91, 404 S.E.2d 227, 233, <u>cert. denied</u>, 502 U.S. 944 (1991).

### C. STATUTORY REVIEW

Pursuant to the provisions of Code § 17.1-313(C)(1), this Court is required to consider and determine whether the death sentence in this case was imposed under the

influence of passion, prejudice, or other arbitrary factors. Morrisette does not point to any such factor, and our review of the record does not reveal any evidence to suggest that Morrisette's sentence of death was based on or influenced by any passion, prejudice, or other arbitrary factors.

We are also required to consider and decide whether Morrisette's sentence of death is "excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." Code § 17.1-313(C)(2). "The purpose of our comparative review is to reach a reasoned judgment regarding what cases justify the imposition of the death penalty." Orbe v. Commonwealth, 258 Va. 390, 405, 519 S.E.2d 808, 817 (1999), cert. denied, 529 U.S. 1113 (2000). In conducting this statutorily mandated review in this case, we have focused on cases in which the victim was murdered during the commission of rape, and in which the sentence of death was imposed based on findings of both "future dangerousness" and "vileness." See, e.g., Swisher v. Commonwealth, 256 Va. 471, 506 S.E.2d 763 (1998), cert. denied, 528 U.S. 812 (1999); Cherrix, 257 Va. 292, 513 S.E.2d 642; Pruett v. Commonwealth, 232 Va. 266, 351 S.E.2d 1 (1986), cert. denied, 482 U.S. 931 (1987); Coleman v. Commonwealth, 226

21

Va. 31, 307 S.E.2d 864 (1983), cert. denied, 465 U.S. 1109 (1984); Mason v. Commonwealth, 219 Va. 1091, 254 S.E.2d 116, cert. denied, 444 U.S. 919 (1979); Smith v. Commonwealth, 219 Va. 455, 248 S.E.2d 135 (1978), cert. denied, 441 U.S. 967 (1979).  We have also considered cases in which defendants received life sentences, rather than the death penalty, for capital murder during the commission of rape.  See, e.g., Horne v. Commonwealth, 230 Va. 512, 339 S.E.2d 186 (1986); Keil v. Commonwealth, 222 Va. 99, 278 S.E.2d 826 (1981).

Morrisette does not argue that his sentence of death is excessive or disproportionate to the penalty generally imposed in comparable cases.  Based on our independent review of this case and similar cases, we conclude that Morrisette's sentence of death is not excessive or disproportionate to sentences generally imposed in this Commonwealth for capital murders comparable to the defendant's murder of Dorothy White.

III. CONCLUSION

For the reasons stated, we find no error in the judgments of the circuit court or in the imposition of the death penalty.  We also perceive no reason to commute the

22

sentence of death in this case.  Thus, we will affirm the
judgments of the circuit court.[8]

                                                    Affirmed.

---

  [8] Morrisette failed to brief the following assignments
of error.  Thus, we will not consider them on appeal.  Bell
v. Commonwealth, 264 Va. 172, 183, 563 S.E.2d 695, ___
(2002); Kasi v. Commonwealth, 256 Va. 407, 413, 508 S.E.2d
57, 60 (1998), cert. denied, 527 U.S. 1038 (1999).
      No. 9:  that portion of this assignment of error
alleging that Code § 19.2-264.3:1(D)-(F) "is in conflict
with the rights of the defendant under the Compulsory
Process Clause . . . and his right against self-
incrimination;"
      No. 12:  the trial court erred in failing to strike
prospective juror Wright;
      No. 18:  the trial court "erred in overruling an
objection to [the introduction of] pictures from trial
without foundation;" and
      No. 20:  the trial court erred in denying a motion to
defer sentencing until the United States Supreme Court
decides an issue regarding whether a mentally retarded
defendant can be sentenced to death.  However, the record
in this case would not support a finding of mental
retardation.  But see Atkins v. Virginia, ___ U.S. ___, 122
S.Ct. 2242 (2002).  Intelligence tests were administered to
Morrisette on two occasions, with resulting I.Q. scores of
77 and 82.  A psychiatrist who evaluated Morrisette with
regard to the present charges opined that Morrisette's
"[i]ntelligence appeared roughly below average."  Although
Morrisette withdrew from school in the eighth grade with
failing grades, he obtained a general equivalency diploma
while serving in the military.