COURT OF APPEALS OF VIRGINIA

Present: Chief Judge Decker, Judge Humphreys, and Senior Judge Annunziata
Argued by teleconference

PUBLISHED

TIMOTHY WARNICK, S/K/A
  TIMOTHY WILLIAM WARNICK

                                                        OPINION BY
v.      Record No. 0616-19-4               JUDGE ROBERT J. HUMPHREYS
                                                        JULY 7, 2020
COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF LOUDOUN COUNTY
Douglas L. Fleming, Judge

Renee Berard (Alex Levay Attorney, P.L.L.C.) and Kelly L. King
(Law Office of Kelly L. King, PLLC), for appellant.

Liam A. Curry, Assistant Attorney General (Mark R. Herring,
Attorney General, on brief), for appellee.


On June 13, 2016, a grand jury in the Circuit Court of Loudoun County ("circuit court")

indicted appellant Timothy Warnick ("Warnick") for two counts of first-degree murder, in

violation of Code § 18.2-32 and one count of robbery, in violation of Code § 18.2-58. The

indictments alleged that Warnick committed these crimes on September 30, 1988. On April 26,

2018, a jury found Warnick guilty of both first-degree murder and robbery.

On appeal, Warnick assigns the following six errors:

  I.    The trial court erred by violating Appellant's constitutional right to due
        process and a fair trial by preventing the introduction of evidence
        pertaining to third-party guilt.

  II.   The trial court erred by violating Appellant's constitutional right to
        confrontation by applying only the *Ramsey* analysis and denying
        Appellant the ability to cross-examine law enforcement witnesses
        regarding the completeness and credibility of their investigation.

  III.  The trial court erred in denying Appellant's motion for mistrial and
        violated Appellant's constitutional rights to due process of law and a fair

trial by permitting Commonwealth witness Tina Thompson to testify that
Appellant rapes women.

IV.     The trial court erred by admitting material impeachment evidence that had
        not been timely disclosed by the Commonwealth in violation of <u>Brady v.
        Maryland</u>.

V.      The trial court erred by ruling that alleged hearsay within hearsay
        statements made by deceased Ellard "Bunk" Jackson were admissible
        under Virginia Rule of Evidence 2:804(b)3(B).

VI.     The trial court erred by denying Appellant's Motion to Dismiss in
        violation of his Fifth Amendment right to due process when the case was
        nearly 30 years old, a number of witnesses were deceased, evidence was
        lost, and no part of the delay was attributed to Appellant.

I. <u>BACKGROUND</u>

On September 30, 1988, Henry Eric Ryan ("Ricky")[1] went to a party at the Shenandoah

River and did not return home. His family reported him missing a few days later, on October 5,

1988.

On the day of Ricky's disappearance, Warnick had been incarcerated at Jefferson County

Jail in West Virginia. Upon his release that afternoon, Warnick went to a party at the

Shenandoah River—the same river party at which Ricky was present. There were about forty

people at the river party. While everyone was "hanging out," Ricky handled cash and drugs in

Warnick's presence. At some point, a group of five people, including Warnick and Ricky, went

on a "beer run" to a place called Kim's Market. After purchasing a case of beer, the entire group

returned to the river at dusk. Then, Ricky, Warnick, and an unknown man went on a second

"beer run" to the Sweet Springs store in Virginia. Ricky did not return to the river from this

_____

[1] Henry Ryan went by "Ricky" during his lifetime, and the parties refer to him as
"Ricky."

second trip. When Warnick and the unknown man returned, they were both "dirty." It looked like Warnick "rolled around outside in the dirt."

On March 14, 1989, Ricky's body was discovered inside a "perc test pit" off of Route 9 in Loudoun County, Virginia. Almost the entire body was covered with dirt. After police uncovered the body, they discovered a prescription pill bottle containing Warnick's name[2] "crushed in [the body's] hand." There was no cash in Ricky's wallet or on his body, nor were there any narcotics on or near the body. It was later determined that Ricky died of blunt force trauma to the head, which was caused by "[s]ome type of blunt instrument," rather than by someone's hand.

Approximately twenty-seven years after the body was found, on June 13, 2016, a grand jury indicted Warnick for first-degree murder and robbery. On March 8, 2017, Warnick filed a motion to dismiss based on a violation of his due process rights because of the pre-indictment delay.

On May 30, 2017, the circuit court held a hearing on Warnick's motion to dismiss based on a violation of his "Fifth Amendment due process" rights. Detective Jay Merchant ("Detective Merchant"), who performed part of the investigation into Ricky's murder, testified that he did not intentionally wait until anyone died in order to charge Warnick. Instead, no one was arrested right away because there was not enough evidence for a conviction, even though police "may have known" who committed the crime. At the time, police did not have evidence of Warnick's confession to several others including his son, Mike Long ("Long").

Detective Steven Schochet ("Detective Schochet"), who investigated the case from 2015 until Warnick was charged, testified that in June of 2016, police and prosecutors determined that

---

[2] The name on the pill bottle was spelled "Tim Warnack."

- 3 -

there was finally enough evidence to present to a grand jury. He testified that between December and June, witnesses were no longer afraid of Warnick and became willing to testify. During this time frame, police also discovered new evidence about Warnick confessing to various people. Some potential witnesses had died by the time Warnick was charged. Detective Schochet testified that "a number" of those witnesses had information that he felt could have helped the Commonwealth and from whom information could no longer be obtained.

After hearing the evidence, the circuit court found that any lost testimony from witnesses now deceased only amounted to possible prejudice to Warnick, rather than actual prejudice, as required by law to dismiss the charges. The court also found that Warnick had failed to show that the Commonwealth's delay in indicting him was intentional "in order to gain a tactical advantage." The court denied Warnick's motion to dismiss the indictment.

On April 18, 2018, the third day of trial, the Commonwealth moved to exclude certain questions by defense counsel to police witnesses regarding following up on other leads because the questions were not relevant evidence of third-party guilt under this Court's holding in Ramsey v. Commonwealth, 63 Va. App. 341 (2014). During the parties' argument on the motion, the circuit court narrowed the issue, stating that the number of leads or information possessed by police was not "really the issue . . . but whether that information fits within the guidance of Ramsey." In ruling, the circuit court clearly specified that it was "only making [its] rulings on . . . third-party guilt," and ruled that the evidence of third-party guilt was inadmissible.

Later, on direct examination, Tina Thompson ("Thompson") testified before the jury that she was friends with Ricky and was present at the river party on September 30. She testified that she had given birth to her baby before the party, in August of 1988. When asked whether Warnick ever spoke to her about Ricky's disappearance, Thompson stated that Warnick told her

"that if [she] went to the cops or if [she] told anybody what [she] knew, that [she] was going to wind up like Ricky." However, she did not know what happened to Ricky at that point.

On cross-examination, after a relevance objection by the Commonwealth, defense counsel told the court that Thompson had previously informed police that she was pregnant when she last saw Ricky. Defense counsel argued that the Commonwealth violated a prior court order requiring the Commonwealth to disclose inconsistent statements by its witnesses, because the Commonwealth did not disclose that Thompson would testify that she was not pregnant when Ricky disappeared. Defense counsel also argued that the Commonwealth violated its duty under Brady v. Maryland, 373 U.S. 83 (1963), and its progeny, to disclose Thompson's inconsistent statement. The circuit court ruled that Warnick had the information in time to cross-examine Thompson with it. Defense counsel proceeded to cross-examine Thompson regarding her inconsistent statements about her pregnancy.

Defense counsel also questioned Thompson about a different inconsistent statement Thompson had given. Thompson responded, "Again, ma'am, I changed my story multiple times. I am petrified of this man. Okay? You don't know what this man has put people through. I seen [sic] this man throw people in the river, rape women." Warnick objected and asked that the testimony be stricken.

At sidebar, the circuit court ruled that Thompson was allowed to explain her inconsistent statement under Rule 2:613 of the Virginia Rules of Evidence. It found that the "door" to such testimony had been opened, and that when Thompson admitted to making inconsistent statements, she was allowed to explain why she did so. Defense counsel responded, "I think that the [c]ourt needs to give the jury a limiting instruction that they cannot consider anything that she is saying for the truth of the matter." The circuit court responded that it would instruct the jury "that Ms. Thompson's statements as to why she has acknowledged giving other statements

- 5 -

to investigators is offered as an explanation as to why she's done it." Warnick instead elected to move for a mistrial in response to the court's ruling, and the circuit court denied the motion for a mistrial. Warnick then resumed cross-examination before the jury without renewing his request for a limiting instruction.

Next, Detective Merchant testified before the jury. On cross-examination, Warnick questioned Detective Merchant about what information was released to the public in the course of his investigation and about his interviews with Warnick.

Throughout the remainder of the trial, several witnesses testified as to incriminating statements made by Warnick. One witness testified that Warnick told her, "I killed a guy. . . . I robbed him for his money and his drugs. I buried him in a shallow grave. . . . I removed his leather jacket." The witness also stated that Warnick said he "made a mistake but [he] still got away with it" because "they found a medicine bottle with [his] name on it in the grave with [the victim]." Long, Warnick's son, testified that Warnick discussed Ricky's murder "[a]bout three times." Warnick said he "didn't mean to do it . . . it was supposed to be a robbery." Long testified that Warnick was "supposed to rob Ricky for his green. And [Warnick] said he hit [Ricky]. And, when he hit him, he realized he had gone too far . . . he had to finish him off and said he hit him a couple more times." Warnick told Long that he had hit Ricky with a club. Warnick repeated the same story to Long on a different occasion.

Later during the trial, the Commonwealth sought to introduce hearsay statements by a man named Ellard Bunk Jackson ("Jackson") through a witness named Brandy Harder ("Harder"). Outside the hearing of the jury, Harder proffered that Jackson told her that Warnick "had told him that he had killed Ricky for money and dope." Jackson told Harder that Warnick stated that he hit Ricky "in the back of the head with a crowbar." Jackson also stated that he knew where the weapon was located but did not go to the police because "he was scared that

they would think that he was involved." The circuit court ruled that Harder's testimony about Jackson's statements was admissible under the statement against interest hearsay exception. Harder testified before the jury that she was Ricky's niece. She testified, "[Jackson] stated to me that he knew that I was Ricky's niece . . . and he proceeded to tell me that Mr. Warnick had stated to him that he had killed Ricky." She also testified that Jackson stated that Warnick killed Ricky "[f]or his money and his dope."

After the Commonwealth rested, Warnick sought to introduce hearsay testimony from Kevin Sowers ("Sowers") that another person named Brian Waldron ("Waldron") confessed to committing the crime, but the Commonwealth argued that the evidence was not shown to be reliable. Outside the hearing of the jury, Sowers proffered that while at a bar, "Brian [Waldron] brought the subject up and said that he was paid by Mike Mood to kill Ricky." Waldron and the people at the bar who may have heard Waldron are deceased. Sowers also testified that he was at the river party the night of Ricky's disappearance and Waldron was there, as well. Next, the circuit court heard *voir dire* testimony from Mike Mood's ("Mood") wife, Lovada Mason ("Mason"). She testified that Mood died in 1997. Mason also testified about an injury Mood had on his hand based on "a fight he had gotten into." When asked whether Mood had gotten into a fight with Ricky, Mason responded that she did not know.

Warnick argued that Waldron's statement was admissible as a statement against penal interest. The court found that the reliability requirement was not met because Waldron's presence at the location of the crime was not enough to amount to "substantial evidence" connecting him with the crime. The circuit court ruled that the evidence was inadmissible because Warnick had not met his burden to show that the evidence was reliable, rather than a bare confession.

At the end of the trial, the jury found Warnick guilty of first-degree murder and robbery. This appeal follows.

## II. ANALYSIS

### A. Standard of Review

"On appeal, the constitutional arguments are questions of law that we review de novo." Shivaee v. Commonwealth, 270 Va. 112, 119 (2005). "The admissibility of evidence is within the broad discretion of the trial court, and a ruling will not be disturbed on appeal in the absence of an abuse of discretion." Amonett v. Commonwealth, 70 Va. App. 1, 9 (2019) (quoting Abdo v. Commonwealth, 64 Va. App. 468, 473 (2015)). This Court also reviews the denial of a motion for a mistrial under the abuse of discretion standard of review. See Bethea v. Commonwealth, 68 Va. App. 487, 500 (2018), aff'd, 297 Va. 730 (2019). If the circuit court makes an error of law, it "by definition abuses its discretion." Coffman v. Commonwealth, 67 Va. App. 163, 166-67 (2017) (quoting Porter v. Commonwealth, 276 Va. 203, 260 (2008)). Although "[i]n reviewing the denial of a Brady motion, the [circuit] court's factual findings will not be disturbed absent clear error," this Court reviews the circuit court's legal conclusions *de novo*. Church v. Commonwealth, 71 Va. App. 107, 116 (2019).

### B. Due Process and a Fair Trial—Introduction of Evidence of Third-Party Guilt

Although a criminal defendant has the right to "call for evidence in his favor," this right is "not boundless." Jones v. Commonwealth, 71 Va. App. 70, 89 (2019) (first quoting Va. Const. art. I, § 8; then quoting Clark v. Commonwealth, 262 Va. 517, 520 (2001)). The evidence Warnick seeks to admit is nonetheless subject to the Virginia Rules of Evidence. See id. at 90.

Under the evidentiary rule setting forth hearsay exceptions when "the declarant is dead or otherwise unavailable," a statement against interest is admissible. Va. R. Evid. 2:804(a), (b)(3).

A statement against penal interest is "[a] statement which the declarant knew at the time of its making would tend to subject the declarant to criminal liability, if the statement is shown to be reliable." Va. R. Evid. 2:804(b)(3)(B). The Supreme Court of Virginia has interpreted the "reliability" requirement in Rule 2:804(b)(3)(B) to require more than a "bare confession," but rather "anything substantial other than the bare confession to connect the declarant with the crime." Ellison v. Commonwealth, 219 Va. 404, 408-09 (1978) (quoting Hines v. Commonwealth, 136 Va. 728, 748 (1923)) ("Thus, we believe it is settled in Virginia that, while a declaration against penal interest is recognized as an exception to the hearsay rule, such a declaration made out of court by a dead or otherwise unavailable witness is admissible only upon a showing that the declaration is reliable."). In Ellison, the Supreme Court of Virginia did not set forth the "quality or quantity of evidence necessary to establish reliability," but instead left the question to the circuit court's discretion "to be determined upon the facts and circumstances of each case." Id. at 408.

Here, the standard set forth in Ellison was not satisfied.[3] Warnick sought to introduce testimony from Sowers that Waldron confessed to killing Ricky because Waldron was paid by Mood to do so. Both parties agree that Waldron and Mood are deceased and therefore unavailable under Rule 2:804. Also undisputed is the fact that Waldron's confession would tend to subject him to criminal liability. However, the reliability requirement is not satisfied because the only evidence Warnick presented to connect Waldron to the crime besides his bare

---

[3] Warnick relies on the standard for introduction of evidence of third-party guilt as set forth in Ramsey v. Commonwealth, 63 Va. App. 341 (2014). However, that case is inapplicable. First, that case does not concern Rule 2:804(b)(3). Second, Ramsey did not concern introduction of evidence of a *confession* by a third party. Instead, the sole issue was relevance where Ramsey sought to introduce evidence of a third party's "propensity for sexual predation, extraordinary violence, and lack of control at the time of the offenses" to show that the third party committed the crimes. Ramsey, 63 Va. App. at 353.

confession was his presence at the river party—a party in which about forty people were present. There was no evidence that Waldron interacted with Ricky on the night of the murder. Further, the statement itself, that Waldron was paid by Mood to kill Ricky, wholly lacks detail about the facts of the murder—the method, means, date, and surrounding circumstances that might suggest that it is reliable.[4]

For these reasons, the circuit court did not abuse its discretion in excluding the evidence as inadmissible hearsay.

C. Right to Confrontation—Ability to Cross-Examine Law Enforcement Witnesses

The Sixth Amendment to the U.S. Constitution states in relevant part, "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. "[T]he Confrontation Clause guarantees only an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." Campos v. Commonwealth, 67 Va. App. 690, 703 (2017) (quoting Abney v. Commonwealth, 51 Va. App. 337, 350 (2008)) (alteration in original). When a witness is "present at trial and subject to cross-examination," the Confrontation Clause is satisfied. See id. at 704, n.2.

In this case, the Confrontation Clause was satisfied as to all of the Commonwealth's witnesses, including law-enforcement witnesses, because they were subject to cross-examination by Warnick. Warnick was not denied his right to cross-examine, and did, in fact, cross-examine

---

[4] Warnick relies on Mason's proffered testimony in attempting to establish a nexus between Mood and the crime stating, "Importantly, Mason . . . did not deny the fight [with Mood and a third party] involved Ricky." However, Mason stated that she did not know with whom Mood got into a fight, and even if she did, the fact that Mood and Ricky may have gotten into a fight at some point in time does not necessarily suggest that Mood hired Waldron to kill Ricky.

Detective Merchant. Warnick fails to point to any portion of the record where the circuit court ruled that he could not cross-examine a witness because, indeed, no such ruling exists. Instead, the circuit court ruled that Warnick could not seek to introduce evidence that a third party committed the crime under Ramsey. The Confrontation Clause was satisfied when Warnick was afforded the opportunity for effective cross-examination; he cannot now complain that his right of cross-examination was infringed upon merely because he did not elicit the testimony he desired. Campos, 67 Va. App. at 703.

To the extent that Warnick's assignment of error complains of a failure to allow him to admit certain types of evidence, he has failed to proffer Detective Merchant's expected answer to the questions he would have asked. Without a proffer, this Court cannot determine whether the circuit court erred regarding the admissibility of Detective Merchant's answers; therefore, the issue is defaulted. See Tynes v. Commonwealth, 49 Va. App. 17, 21-22 (2006) ("The failure to proffer the *expected testimony* is fatal to [one's] claim on appeal." (quoting Molina v. Commonwealth, 47 Va. App. 338, 367-68 (2006))).

D. Motion for Mistrial—Permitting Commonwealth Witness to Testify to Prior Bad Acts

Under the Virginia Rules of Evidence, a witness must "first [be] given an opportunity to explain or deny" a prior inconsistent oral statement before extrinsic evidence of such statement can be admitted. Va. R. Evid. 2:613(a)(ii). Further, extrinsic evidence of a witness's prior inconsistent statement is only admissible if the witness "denies or does not remember the prior inconsistent statement." Va. R. Evid. 2:613(a).

In this case, the circuit court relied on Rule 2:613 in allowing Thompson to testify that she made inconsistent statements because she was afraid of Warnick, since he had "raped women." However, Warnick was not attempting to introduce extrinsic evidence of Thompson's

inconsistent statement; thus Rule 2:613(a)(ii) does not apply.[5] Although reliance on this particular rule was error, the circuit court reached the correct result. See generally Spinner v. Commonwealth, 297 Va. 384, 391 (2019) (stating that the right result for a different reason doctrine is applicable where "the record on appeal fully supports the appellee's argument on appeal").

Instead of Rule 2:613, Virginia caselaw establishes that "[a] witness may be allowed to explain a prior inconsistent statement, and his explanation should be received and considered by the jury." Smith v. Commonwealth, 15 Va. App. 507, 513 (1992) (quoting Crumpton v. Commonwealth, 9 Va. App. 131, 136 (1989)). Under this rule, Thompson's testimony was not admissible for its truth, but simply as an explanation of why her statements were inconsistent. See id. The circuit court did not err in admitting the statements for this purpose. Warnick's failure to renew his request for a limiting instruction after his motion for a mistrial was denied cannot be considered an error by the circuit court because it appeared that Warnick abandoned his request for a limiting instruction by requesting a mistrial instead. See Ludwig v. Commonwealth, 52 Va. App. 1, 16 (2008) (stating that the circuit court did not have a duty to provide a cautionary instruction *sua sponte*).[6] Thus, the circuit court was within its discretion in refusing to grant a mistrial.

---

[5] Thompson also admitted to making inconsistent statements, so extrinsic evidence would not have been admissible, in any event.

[6] On brief, Warnick also complains of Thompson's remarks that she was "scared to death" of Warnick, that he had threatened to kill her, and that he was "evil." However, these issues are not encompassed in his assignment of error or preserved below. See Rule 5A:12(c)(1)(i) ("Only assignments of error assigned in the petition for appeal will be noticed by this Court."); Rule 5A:18 (requiring an objection "stated with reasonable certainty at the time of the ruling").

E. Brady Violation: Admitting Material Impeachment Evidence[7]

In Brady v. Maryland and its progeny, the Supreme Court of the United States held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. 83, 87 (1963). In other words, Brady set forth the prosecution's duty "to disclose material exculpatory evidence." Church, 71 Va. App. at 116 (citing Brady, 373 U.S. 83); see also Strickler v. Greene, 527 U.S. 263, 280 (1999) (explaining that the duty to disclose exculpatory and impeachment evidence applies even when the defendant does not request such evidence).

A violation of the Brady rule occurs when (1) "the prosecution . . . suppressed the evidence, either purposefully or inadvertently;" (2) the evidence in question is "favorable to the accused" because it is exculpatory evidence or impeachment evidence; and (3) the evidence is "material." Church, 71 Va. App. at 117. The third requirement, materiality, is satisfied when "there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different." Id. (quoting Commonwealth v. Tuma, 285 Va. 629, 634-35 (2013)). The materiality requirement has also been phrased in terms of whether the defendant has been prejudiced. See Strickler, 527 U.S. at 281-82; see also Deville v. Commonwealth, 47 Va. App. 754, 756-57 (2006).

---

[7] Although Napue v. People of State of Ill., 360 U.S. 264, 269 (1959) rather than Brady more accurately encompasses Warnick's argument, he does not cite this case. See generally Napue, 360 U.S. at 269 ("The principle that a State may not knowingly use false evidence, including false testimony, to obtain a tainted conviction, implicit in any concept of ordered liberty, does not cease to apply merely because the false testimony goes only to the credibility of the witness.").

Here, Warnick argues that the circuit court improperly admitted Thompson's statement that she had given birth before the night of Ricky's disappearance.[8] The circuit court did not make any factual findings as to whether the Commonwealth had withheld <u>Brady</u> material from Warnick, but instead ruled that Warnick had the information in time to cross-examine Thompson with it. Assuming, without deciding, that the circuit court's ruling implicitly found as a matter of fact that the Commonwealth withheld Thompson's inconsistent statement, Warnick's <u>Brady</u> argument nonetheless fails. Although a materially inconsistent statement by a witness is subject to <u>Brady</u> because it may be used for impeachment purposes—thereby satisfying the second prong of <u>Brady</u>—Thompson's inconsistent statement is not material to any issue in the case. Whether Thompson was pregnant on September 30, 1988, has nothing to do with the underlying facts of the crime. Warnick suggests that Thompson's inconsistency means that "[s]ince Ms. Thompson gave birth to her son on August 14, 1988, the last time Tina Thompson saw Ricky must have been prior to August 14, 1988." However, Thompson specifically testified that she was present at the river party *on September 30, 1988*.

Further, "<u>Brady</u> is not violated, as a matter of law, when impeachment evidence is made 'available to [a] defendant[] during trial' if the defendant has 'sufficient time to make use of [it] at trial.'" <u>Tuma</u>, 285 Va. at 635 (alterations in original) (quoting <u>Read v. Virginia State Bar</u>, 233 Va. 560, 564-65 (1987)). In this case, Thompson's inconsistent statement was elicited by the Commonwealth on direct examination, giving Warnick notice of it before cross-examination. In

---

[8] The Commonwealth argues that the assignment of error is defaulted under Rule 5A:12(c)(1) because "[n]either the assignment of error nor Warnick's opening brief describes what impeachment evidence was *improperly admitted* at trial." However, this argument is misguided because Warnick clearly argues that Thompson's statement that she was not pregnant when she last saw Ricky, a statement inconsistent with her previous statements, was improperly admitted. Further, this argument is fairly encompassed within the language of Warnick's assignment of error.

fact, Warnick repeatedly cross-examined Thompson about her inconsistency. Thus, there was no Brady violation.[9]

## F. Admission of Hearsay Within Hearsay

For this assignment of error, at issue is Harder's trial testimony that Jackson told her that Warnick confessed to Jackson. In essence, Harder testified that Jackson approached her and told her that Warnick told him that Warnick had killed Ricky in order to obtain Ricky's money and drugs. Under the Virginia Rules of Evidence, hearsay is a statement made out-of-court which is "offered in evidence to prove the truth of the matter asserted." Va. R. Evid. 2:801(c). Hearsay is inadmissible unless an exception to the general prohibition against its admission applies. Va. R. Evid. 2:802. When there are multiple levels of hearsay, each level must be justified by an exception in order to be admissible. Va. R. Evid. 2:805.

In this case, Warnick's confession to Jackson that he killed Ricky for money and drugs is one level of hearsay. Warnick's confession occurred out of court, and it was offered to prove the truth of the matter asserted—that Warnick in fact killed Ricky. Since this statement is hearsay, it is necessary to determine whether an exception applies. Under the "party-opponent" exception, "[a] statement offered against a party that is . . . the party's own statement" is admissible against him. Va. R. Evid. 2:803(0). Here, Warnick is the person who made the statement to Jackson. Since the statement was offered by the Commonwealth against Warnick at trial, it falls into the "party-opponent" exception. The parties do not dispute the applicability of this exception.

---

[9] On brief, Warnick argues that the Commonwealth also failed to disclose Thompson's inconsistency as to the number of "beer runs" in which Ricky participated. Warnick has failed to preserve the issue in his assignment of error and below. See Rule 5A:12(c)(1); Rule 5A:18. Even if the issue were preserved, the number of "beer runs" in which Ricky participated is not material evidence.

Second, Jackson's statement to Harder is an additional level of hearsay. Jackson's statement to Harder—that Warnick confessed to killing Ricky—was offered for its truth. The Commonwealth sought to prove that Warnick in fact confessed and committed the crimes confessed. The circuit court ruled that this statement was admissible as a "statement against interest" under Rule 2:804(b)(3)(B). Warnick alleges that the exception is inapplicable, and the admission of this statement was error.

Under Rule 2:804, when a declarant is unavailable, "[a] statement which the declarant knew at the time of its making would tend to subject the declarant to criminal liability" is admissible "if the statement is shown to be reliable." Va. R. Evid. 2:804(b)(3)(B). The party seeking to introduce the evidence must show (1) that the declarant is unavailable, (2) the statement was against the declarant's penal interest when he or she made it, (3) the declarant subjectively knew that the statement was against his interest, and (4) that there is other evidence in the record of the statement's reliability that connects the declarant with the crime. See Bailey v. Commonwealth, 62 Va. App. 499, 504-05 (2013). "To be considered as being against the declarant's penal interest, it is not necessary that the statement be sufficient on its own to charge and convict the declarant of the crimes detailed therein." Lilly v. Commonwealth, 255 Va. 558, 573 (1998), rev'd on other grounds, 527 U.S. 116 (1999) (reversal based on the Confrontation Clause).

Here, as the one who made the statement, Jackson is the declarant. Because he is deceased, he is unavailable, which is undisputed. Instead, the parties dispute the second and third elements. The Commonwealth seems to omit the second element, arguing that the declarant's subjective belief that the statement was against his interest is sufficient. However, this argument contravenes established caselaw. See Bailey, 62 Va. App. at 504-05. As Warnick correctly argues, even though there is evidence in the record that Jackson feared that police

would think he was involved in the murder, the statement at issue does not implicate any criminal liability on Jackson's part. Thus, the statement at issue, that Warnick was the person who killed Ricky, does not satisfy the second element since it only involves Warnick's penal interest and not Jackson's. For these reasons, the circuit court erred in admitting the testimony.

However, this error is subject to harmless error analysis. See Nunez v. Commonwealth, 66 Va. App. 152, 158 (2016) (explaining that under Code § 8.01-678, harmless error analysis is required in every case). Among the circumstances in which harmless error occurs is when the improperly admitted evidence was "merely cumulative of other, undisputed evidence." McLean v. Commonwealth, 32 Va. App. 200, 211 (2000) (quoting Ferguson v. Commonwealth, 16 Va. App. 9, 12 (1993)).

In this case, the same evidence came in through two other witnesses. One witness testified that Warnick told her that he had killed someone for the person's money and drugs. Warnick's son, Long, testified that Warnick told him multiple times that Warnick robbed and killed Ricky for his money and his "green." For these reasons, although the circuit court erred, the error did not affect the outcome of the case and was harmless.

G. Denying Appellant's Motion to Dismiss: Violation of Fifth Amendment Due Process[10]

"In cases of pre-indictment delay, the issue is whether the accused was denied due process as a result of the delay." Hall v. Commonwealth, 8 Va. App. 526, 529 (1989). "Due process principles bar a prosecution for pre[-]indictment delay only when the 'defendant incurred actual prejudice as a result of the delay' and the 'prosecutor intentionally delayed indicting the

---

[10] Warnick's assignment of error references Fifth Amendment due process, which only applies to the federal government, not the states or local governments. Key v. Robertson, 626 F. Supp. 2d 566, 579 (E.D. Va. 2009). Since it is apparent from his arguments below and on appeal that the substance of his argument is in fact a Fourteenth Amendment due process argument, we nonetheless consider it on that basis.

defendant to gain a tactical advantage.'" Anderson v. Commonwealth, 48 Va. App. 704, 712 (2006) (quoting Morrisette v. Commonwealth, 264 Va. 386, 393 (2002)). Warnick must show both (1) "actual prejudice" and (2) "improper purpose." Id. (quoting Morrisette, 264 Va. at 393).

In this case, the crime was committed in 1988, and Warnick was indicted in 2016. Thus, there was a 28-year pre-indictment delay. However, Warnick has failed to satisfy his burden to show both actual prejudice and the Commonwealth's intentional delay for an improper purpose. Although Warnick mentions thirteen relevant witnesses who died because of the delay, he fails to state with any specificity what information these witnesses possessed that would have been helpful to his case. The record also contains evidence that several of those deceased witnesses had information that may have been helpful to the Commonwealth. Additionally, there was no evidence that the delay was intentional on the part of the Commonwealth to obtain a tactical advantage. The record reflects that the only reason for any delay was a lack of evidence because witnesses initially refused to testify because of their fear of Warnick.

For these reasons, Warnick was not denied due process, and the circuit court did not err in denying Warnick's motion to dismiss.

## III. CONCLUSION

For the reasons stated above, the circuit court did not deny Warnick any of his constitutional rights under the Sixth and Fourteenth Amendments, and further, because certain hearsay statements about which Warnick complains were either properly admitted or admitted harmlessly, the judgment below is affirmed.

Affirmed.